[Nos. A105638, A106198. First Dist., Div. One. Apr. 13, 2005.]

JOHN GARAMENDI, as Insurance Commissioner, etc., Plaintiff and Respondent, v.
GOLDEN EAGLE INSURANCE COMPANY, Defendant;
KEVIN CURRY et al., Claimants and Appellants.

COUNSEL

Dunk & Associates, Rick L. Bove and Andrew P. P. Dunk III for Claimants and Appellants.

Orrick, Herrington & Sutcliffe, Cynthia J. Larsen, Thomas J. Welsh and William T. Darden for Plaintiff and Respondent.

OPINION

MARGULIES, J.—These consolidated appeals seek review of a trial court decision affirming the rejection by the Insurance Commissioner (commissioner) of certain claims against defendant Golden Eagle Insurance Company (Golden Eagle), an insurance company in conservatorship. Appellants, two former employees of Golden Eagle, filed claims in the conservatorship proceedings to recover for alleged fraudulent inducement of their employment contracts, wrongful discharge, defamation, and intentional infliction of emotional distress. After investigation, the commissioner rejected the claims as factually and legally unfounded.

In an order to show cause (OSC) proceeding brought in the trial court to review the commissioner's rejections, appellants submitted a substantial quantity of evidence that had not been considered by the commissioner

during the investigation of the claims. The trial court refused to consider this evidence in reviewing the validity of the commissioner's decisions, but the court offered to send the matter back to the commissioner for further consideration in light of the additional evidence. When appellants declined this opportunity, the trial court ruled that the commissioner's rejections did not constitute an abuse of discretion, based on the evidence before the commissioner at the time the determinations were made. We affirm, concluding that the trial court was correct in refusing to consider the supplemental evidence proffered by appellants.

## I. BACKGROUND

In an order filed January 31, 1997, Golden Eagle was placed in conservation upon application by the commissioner pursuant to Insurance Code section 1011. Appellants Kevin Curry and George Kevin Auen are one time employees of Golden Eagle. The day before Golden Eagle was placed in conservatorship, Curry filed a class action on behalf of Golden Eagle employees against the company and certain individual defendants, alleging causes of action for fraudulent inducement to contract and wrongful termination. Pursuant to the general terms of the conservancy order, that action has been stayed since its inception.

While working at the company, appellants independently discovered evidence of fraudulent business activities at Golden Eagle. In May 1996, approximately eight months before the commissioner seized control of Golden Eagle, counsel representing both appellants revealed their discoveries to the company and began negotiations with respect to possible remedial actions. By the time counsel contacted the company, Curry had already left Golden Eagle's employ. Auen, in contrast, did not quit his job until after the conservatorship began. The exact role of appellants' revelations in the commissioner's seizure of Golden Eagle is not clear from the record before us, but appellants appear to have played a significant part in the commissioner's investigation of the company's affairs.

As part of a plan of rehabilitation for Golden Eagle approved after its seizure, the commissioner instituted a claims procedure for creditors of the company. (See generally, Ins. Code, § 1021.) The "Proof of Claim Instructions" issued by the commissioner instructed claimants to fill out an attached one-page form containing basic information for each claim. Claimants were told, "You must also provide sufficient information and documents supporting your claim and attach them to the form." More specific instructions emphasized the importance of this submission: "Please provide a detailed explanation of your claim, and attach as many additional pages as are necessary to explain your claim in detail. You may be asked for further information before

a determination is made on your claim, but there is no requirement that you be so contacted. You are therefore advised that you should describe the facts surrounding your claim in detail, and provide the calculations or documents supporting the 'total amount' of your claim, because your claims may be determined based on this information alone."

Pursuant to that procedure, appellants filed timely proofs of claim on January 29, 1998, asserting claims for wrongful termination, fraudulent inducement of employment contract, defamation, and intentional infliction of emotional distress. In lieu of providing the "detailed explanation" called for by the instructions, appellants' forms noted, "See attachments." The attachments included (1) a conclusory statement of the damages claimed by each appellant; (2) a descriptive statement drafted in the form of a judicial complaint, signed by appellants' attorney, that contained joint allegations to support their claims for defamation and intentional infliction of emotional distress; (3) a few letters, some written by appellants' counsel; (4) a series of evidentiary documents relating to the underlying fraud that appellants claimed to have discovered; and (5) a copy of the class action complaint filed by Curry, the allegations of which supported their claims for wrongful termination and fraudulent inducement of employment contract. There were no personal statements by appellants.

The commissioner's investigation of appellants' claims appears to have been conducted primarily by an associate attorney of a private law firm representing the commissioner.[1] According to a declaration subsequently prepared by the attorney, his investigation encompassed, in addition to the materials submitted with appellants' claims, appellants' Golden Eagle personnel files, depositions of appellants taken as part of the commissioner's preconservatorship investigation of Golden Eagle's activities, and declarations by participants in that investigation. The attorney also spoke with appellants' counsel to obtain additional evidence and interviewed appellants' former supervisors at Golden Eagle, both of whom flatly contradicted many of appellants' contentions. A summary of these interviews was prepared for the commissioner's consideration.

On March 19, 2002, the commissioner issued boilerplate notices of rejection of appellants' claims, stating that the claims were "without legal or

---

[1] The investigation and subsequent determination were performed by the Golden Eagle Liquidating Trust, an entity established by the commissioner to administer "non-covered" claims, those that did not arise out of insurance policies issued by Golden Eagle. (See *Low v. Golden Eagle Ins. Co. (Gluckman)* (2002) 101 Cal.App.4th 1354, 1359 [125 Cal.Rptr.2d 155] (*Low I*) [briefly recounting the history of the Golden Eagle conservatorship].) For simplicity, in this decision we will refer to the activities of the Golden Eagle Liquidating Trust, its counsel, and its trustees as those of the commissioner.

factual merit." The notices of rejection did not otherwise explain the bases of the rejections.[2]

On April 17, 2002, appellants filed in the trial court applications for an OSC why their claims should not be allowed, as directed by Insurance Code section 1032. The applications for the OSC were accompanied by a memorandum of points and authorities and a set of evidentiary materials, some of which had not been submitted to the commissioner during the claims process. At the initial hearing regarding the OSC application, the trial court noted that before a final decision could be made it was necessary to determine (1) exactly what materials the commissioner reviewed, and (2) whether it was appropriate to permit additional discovery regarding appellants' claims. The court indicated a willingness to entertain motions by appellants for further discovery. No such motions were made.

At the next hearing, on February 7, 2003, the trial court again expressed a willingness to permit additional discovery and gave the parties leave to file "whatever else you believe needs to be considered—either side needs to be considered at this hearing." Appellants subsequently filed a significant amount of additional evidence, including their own declarations and a declaration by a damages expert. Virtually none of this additional evidence had been submitted to the commissioner during the claims process.

At this point, nearly a year after appellants had applied for an OSC challenging the claims rejections, the commissioner had yet to file any type of administrative record, although his counsel had submitted a declaration that described at least some of the materials the commissioner had reviewed. On March 27, 2003, the trial court issued an order directing the commissioner to lodge with the court the materials listed in that declaration. These documents served as the administrative record before the trial court, and must serve that function here, although it is not clear that they constitute a comprehensive collection of the documents considered by the commissioner.[3] The collection filled eight volumes, although with some duplication of materials.

At a further hearing before the trial court on May 2, 2003, the court indicated that it tentatively had decided to affirm the commissioner's rejections of appellants' claims. In doing so, the trial judge noted that his review

---

[2] It has long been held that proceedings conducted in the context of conservatorships under the Insurance Code are "special proceedings" that do not require findings of fact or conclusions of law. (*Carpenter v. Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 328 [74 P.2d 761] (*Carpenter*); *Low I, supra,* 101 Cal.App.4th at p. 1367.)

[3] The documents ordered submitted by the trial court were those that the commissioner's investigating attorney specifically acknowledged having reviewed in connection with appellants' claims. Because that attorney stated that the documents he reviewed "included, but were not limited to" those listed, there is no guarantee that the documents submitted constituted all of materials actually reviewed by the commissioner in the determination of appellants' claims.

of the commissioner's action was restricted to "whether Golden Eagle or the deputy trustees abused their discretion in denying this claim based on the evidence that was before them at the time that they denied the claim. There has been additional evidence that's been proffered, but apparently was not looked at by them. And in making this determination I believe I'm limited to a review of what they reviewed." Nonetheless, the trial court was "very concerned about due process in this case," in large part because the commissioner relied on an ex parte interview of Curry's supervisor, rather than on testimony taken at deposition, and on depositions of appellants that focused more on the alleged insurance fraud at Golden Eagle than on the merits of their employment-related claims.

At this hearing, the trial court again expressed a willingness to entertain a request for further discovery by appellants. Counsel for appellants declined the opportunity to obtain further discovery, apparently because he was skeptical that the commissioner would fairly evaluate any additional evidence submitted by appellants. In response, the trial judge reiterated his tentative decision to affirm the rejection of appellants' claims and the limited nature of his review. The judge then suggested that he was willing to remand the matter to provide appellants a second opportunity to persuade the commissioner, using the additional evidence already submitted to the court and any other evidence gained during future discovery: "I am giving you the opportunity to go back and present that evidence to them so they can make that decision. . . . If you are going to stand on the record at this point, I'm telling you what's going to happen." When counsel responded that he believed appellants had already submitted sufficient evidence to support reversal of the commissioner's decision, the court responded, "Fine. [But] [t]hat [evidence] has to be reviewed by [the commissioner], not by me. . . . I do not make an independent decision in this matter." When counsel once more expressed skepticism about the commissioner's willingness to consider in a fair manner any additional evidence, the court responded, "Counsel, you send them a letter with your evidence indicating what you want them to review. It's their obligation to review it. If they fail to review that, I will have before me what they have, what they should have reviewed, and to the extent that they didn't review it, that's obviously going to be a factor as to whether they abused their discretion." The court concluded the hearing by directing appellants' counsel to submit a detailed plan of additional discovery needed, in apparent anticipation of a remand to the commissioner.

Appellants never availed themselves of the opportunity for a remand. Although they submitted a document entitled "Claimants' Proposed Discovery Plan," the court found that the plan "did not seek any discovery on the merits of [the] claims" but merely "sought . . . admissions from the *Trustee* to the effect that the claims should have been initially accepted at the time they were first presented." (Original italics.) Concluding that appellants' counsel

had "ignored" his concerns and order, the trial judge rejected the proposed plan at the next hearing, on December 19, 2003. Rather than take advantage of the court's earlier offers to allow resubmission of the claims to the commissioner, counsel for appellants insisted on "a ruling . . . on the merits." In response, the trial court adopted his tentative ruling, stating, "The issue before me was did the commissioner abuse his discretion in making the determination it made on the basis of the evidence it had before it. And I was provided with the evidence which they say was reviewed by them and based on their—the evidence that was reviewed by them and their decision I do not find that they abused their discretion." In a written order issued later that day, the trial court reaffirmed its ruling. The court also dismissed Golden Eagle as a defendant in Curry's class action, concluding that the claims presented in Curry's proof of claim were identical to those alleged in the class action.

## II. DISCUSSION

A. *The Role of Extrinsic Evidence in the Review of the Commissioner's Claims Determinations*

Appellants have briefed their appeal without making any distinction between evidence that was actually considered by the commissioner and evidence submitted only later to the trial court.[4] In contrast, the commissioner insists that only evidence he reviewed may be considered in evaluating the rejections. As a preliminary matter we must decide whether the trial court was entitled to consider, in reviewing the commissioner's rejection of appellants' claims, evidentiary material submitted by appellants that was not considered by the commissioner in making his determinations. This appears to be a matter of first impression.[5]

Resolving this issue requires a general review of the statutes regulating the state's takeover of a troubled insurance company. Insurance Code section 1011 authorizes the commissioner to apply to the superior court for an order creating a conservatorship over the assets of an insurance company upon a showing that, in very general terms, the insurer is "in such condition that its further transaction of business will be hazardous to its policyholders,

---

[4] The statements of facts in appellants' opening briefs, particularly in their appeal of the rejection of the fraudulent inducement and wrongful termination claims, rely primarily on declarations submitted to the trial court that were not before the commissioner.

[5] Despite the centrality of this issue, the commissioner's brief simply assumes without serious discussion that the trial court could not consider "extrinsic" evidence. While appellants discuss the issue, they cite only *Caminetti v. Pacific Mut. Life Ins. Co.* (1943) 23 Cal.2d 94, 101–102 [142 P.2d 741] and *Jauregi v. Superior Court* (1999) 72 Cal.App.4th 931, 939 [85 Cal.Rptr.2d 553], neither of which has any direct application. In our own search, we have located no prior authority addressing this issue in the context of insurance insolvency proceedings.

or creditors, or to the public," including insolvency. (Ins. Code, § 1011, subds. (d) & (i).) Upon such a showing, the trial court is directed to enter an order vesting title to "all of the assets" of the insurer in the commissioner and directing the commissioner "to conduct, as conservator, the business" of the insurer, to the exclusion of the insurer's officers and employees. (Ins. Code, § 1011.) If the commissioner concludes that "it would be futile to proceed as conservator with the conduct of the business" of the insurer, the commissioner "may apply to the court for an order to liquidate and wind up the business." (Ins. Code, § 1016.) The trial court overseeing the conservatorship is vested with substantial authority to aid the commissioner in the conduct of the troubled insurer's business or liquidation, including the power to enjoin the prosecution of pending actions against the insurer. (Ins. Code, § 1020 & subd. (c).)

■ Once an order has been issued authorizing liquidation, the commissioner is directed to give notice to all shareholders and potential creditors of the insurer, who are provided six months to file with the commissioner any claims they might have against the insurer. (Ins. Code, § 1021.) Claimants are specifically directed to "set forth, under oath" a specific list of information, including "[t]he particulars" of the claim, whether it is secured, the amount, and "[s]uch other data or supporting documents as the commissioner requires." (Ins. Code, § 1023.) Claims not submitted in accord with the statutory requirements "shall not be entitled to filing or allowance, and no action may be maintained thereon." (Ins. Code, § 1024.)[6] If the commissioner rejects a claim, "the claimant may apply to the court in which the liquidation proceeding is pending for an order to show cause why the claim should not be allowed." (Ins. Code, § 1032.) Jurisdiction over lawsuits against the insurer, including those pending at the time of the conservatorship, and jurisdiction over lawsuits brought by the commissioner in the exercise of the commissioner's authority as conservator is vested in the trial court overseeing the conservatorship. (Ins. Code, § 1058.)

Although courts have sometimes looked to the provisions of the federal Bankruptcy Code for guidance in interpreting the Insurance Code's insolvency provisions (e.g., *Webster v. Superior Court* (1988) 46 Cal.3d 338, 347–353 [250 Cal.Rptr. 268, 758 P.2d 596] (*Webster*); *Low v. Lan* (2002) 96 Cal.App.4th 1371, 1378 [118 Cal.Rptr.2d 60]; *Garamendi v. Executive Life Ins. Co.* (1993) 17 Cal.App.4th 504, 516 [21 Cal.Rptr.2d 578]), the two schemes are significantly different in their treatment of claims. Under federal

---

[6] Persons having an "unliquidated claim"—that is, one "upon which a right of action has accrued . . . and upon which the liability has not been determined or the amount thereof liquidated"—are nonetheless required to file claims within the statutory period, although such claims cannot be paid until they "have been definitely determined, proved and allowed." (Ins. Code, § 1025.)

bankruptcy practice, the entity conducting the affairs of the debtor has no responsibility for resolving the merits of claims. The debtor's trustee may object to claims believed to be unjustified, but it is the bankruptcy judge who determines the validity of disputed claims. (11 U.S.C. § 704(5); *In re G.I. Industries, Inc.* (9th Cir. 2000) 204 F.3d 1276, 1280; 28 U.S.C. § 157(b)(2)(B); *In re Cambridge Biotech Corp.* (Fed. Cir. 1999) 186 F.3d 1356, 1371–1372; *In re McLaren* (6th Cir. 1993) 3 F.3d 958, 965.) The trustee is therefore restricted to the role of, in effect, advocate for the interests of the estate of the debtor, while the judge is a neutral arbiter between debtor and claimants. The bankruptcy court's rulings on claims are made only after the claimant is given the opportunity for a formal evidentiary hearing. (11 U.S.C. § 502(b); *In re Porges* (2d Cir. 1995) 44 F.3d 159, 164.)

 In contrast, the Insurance Code vests the commissioner with the responsibility for acting both as "receiver or trustee" for the troubled insurer (*Anderson v. Great Republic L. Ins. Co.* (1940) 41 Cal.App.2d 181, 188 [106 P.2d 75]) and as the adjudicator of claims against the company. (Ins. Code, § 1021; *Webster, supra*, 46 Cal.3d at p. 353.) Moreover, the commissioner has no statutory obligation to provide claimants a formal hearing when determining claims. Although the Insurance Code does not specify the procedure the commissioner is to use in evaluating claims, it has been assumed that an informal process is adequate. Commenting upon the obligation of the commissioner in handling a personal injury claim against an insolvent insurer, the Supreme Court noted in *Webster*, "If [the plaintiff] were forced to submit to the statutory claims procedure, the commissioner would have to conduct a thorough investigation of the claim to determine whether to pay it and, if so, how much . . . . [Insurance Code section 1058] suggests that a full and fair determination of a claim is required." (*Webster*, at p. 353.) The commissioner's determination of claims without providing a hearing to the claimant has been held not to constitute a denial of due process. (*Low I, supra*, 101 Cal.App.4th at p. 1367.)[7]

 If the trial court is asked to review the rejection of a claim, its review is conducted "in a summary show-cause procedure" under Insurance Code section 1032. (*Webster, supra*, 46 Cal.3d at p. 347.)[8] It has consistently been

---

[7] Appellants did not contend that the procedure employed by the commissioner here was inadequate, unlawful or unconstitutional. As a result, we have no occasion to address the fairness or constitutionality of the commissioner's powers or actions.

[8] Since the time of *Carpenter, supra*, 10 Cal.2d at page 329, it has been presumed that the trial court's role in considering a rejected claim under Insurance Code section 1032 is one of review of the commissioner's decision, rather than de novo consideration of the merits of the claim. As originally enacted in 1933, the statutory predecessor to section 1032 stated that, upon rejection of a claim by the commissioner, the claimant "may present his claim, by way of an order to show cause, to the court in which the liquidation proceeding is pending." (Stats. 1933, ch. 534, § 8c, p. 1422.) That language suggests, although not unambiguously, that the

held that the trial court, acting on an OSC, must affirm the actions of the commissioner as conservator unless they constitute an abuse of discretion. The abuse of discretion standard was originally applied to the commissioner's adoption of a plan of rehabilitation for the insolvent insurer, an administrative action requiring the exercise of a large degree of discretion. (*Carpenter, supra,* 10 Cal.2d at p. 329 ["The only restriction on the exercise of [the commissioner's] power is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory"]; *Commercial Nat. Bank v. Superior Court* (1993) 14 Cal.App.4th 393, 398 [17 Cal.Rptr.2d 884], citing *Carpenter; In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 358 [38 Cal.Rptr.2d 453]; *Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 466 [54 Cal.Rptr.2d 112].) The same standard has more recently been applied as well to review of the commissioner's determination of claims. (*Low I, supra,* 101 Cal.App.4th at p. 1368 [noting that the appellant did not challenge application of the abuse of discretion standard in the trial court]; *Low v. Golden Eagle Ins. Co. (U.S. Continental Marketing, Inc.)* (2002) 104 Cal.App.4th 306, 316 [128 Cal.Rptr.2d 423].)[9]

■ Applying the abuse of discretion standard, a trial judge is required to affirm the commissioner's rejection of a claim unless: (1) the commissioner did not fulfill his obligation to provide "a full and fair determination" of the claim by, for example, failing to "conduct a thorough investigation of the claim" (*Webster, supra,* 46 Cal.3d at p. 353; see *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 89 [133 Cal.Rptr.2d 234] [failure to provide fair procedures or proceed in the manner required by law is an abuse of discretion]; Code Civ. Proc., § 1094.5); (2) the commissioner's decision to reject the claim was not supported by substantial evidence (e.g., *Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1109 [19 Cal.Rptr.3d 469]); or (3) the commissioner applied an improper legal standard or otherwise based the determination on an error of law. (*Quackenbush v. Mission Ins. Co., supra,* 46 Cal.App.4th at p. 466.)

■ In light of this background, we now address the question originally posed: whether the trial court, in reviewing the rejection of appellants' claims, was permitted to consider evidence that was not before the commissioner. For the reasons set forth below, we conclude that the trial court may

Legislature anticipated de novo hearing of claims in the trial court. When the Insurance Code was recodified two years later, the Legislature changed the language to the current formulation, which states that a claimant whose claim has been rejected "may apply to the court . . . for an order to show cause why the claim should not be allowed." (Stats. 1935, ch. 145, § 1032, pp. 544–545.) The current language is more consistent with the presumed role of review.

[9] As in *Low I, supra,* 101 Cal.App.4th at page 1368, appellants here do not challenge application of the abuse of discretion standard. We therefore have no occasion to consider whether a different standard should be applied to the review of the commissioner's claims determinations.

use evidence that was not before the commissioner in ruling on extrinsic issues, such as the fairness and thoroughness of the commissioner's procedures, but in evaluating the commissioner's ruling on the merits of a claim the trial court is restricted to evidence that was actually before the commissioner.

The Legislature's adoption of an OSC as the procedural vehicle for review of the commissioner's decisions suggests that it intended to permit the submission of evidence with an application for review. OSC's are ordinarily accompanied not only by a declaration of counsel but also by supporting evidentiary documents, where needed. (6 Witkin, Cal. Procedure (4th ed. 1997) § 56, pp. 455–456.) The feature that distinguishes a proceeding on OSC from a trial is the summary nature of the OSC proceeding, which the court is empowered to decide on the basis of written evidentiary materials without taking live testimony. (*Eddy v. Temkin* (1985) 167 Cal.App.3d 1115, 1120–1121 [213 Cal.Rptr. 597]; *Reifler v. Superior Court* (1974) 39 Cal.App.3d 479, 485 [114 Cal.Rptr. 356].) Consistent with this understanding, trial courts have often considered evidence submitted by the parties as part of the "summary procedure" (*Webster, supra,* 46 Cal.3d at p. 347) used in reviewing the commissioner's decisions.[10]

It is significant that in most of the reported cases in which evidence has been accepted during review of a commissioner's action, the action under review was the adoption of a plan of rehabilitation. Adoption of such a plan calls for the exercise of a high degree of discretion, requiring the commissioner to find a balance among the varying interests of the public and the insurer's policyholders, creditors, shareholders and employees. Because the commissioner does not necessarily provide a means for the public to submit evidence during the formulation of such a plan, it is appropriate for the trial court, in reviewing the adoption of the plan, to accept evidentiary submissions from the various parties concerned about the plan's impact.

In distinct contrast to the adoption of a plan of rehabilitation, the commissioner's determination of claims is adjudicatory in nature. While there is no formal hearing, each claimant is given an opportunity through the claims filing process to submit evidence with his or her claim, and the commissioner presumably gathers further evidence during the "thorough investigation" (*Webster, supra,* 46 Cal.3d at p. 353) required to resolve the

---

[10] See, e.g., *Pacific Mut. Life Ins. Co. v. McConnell* (1955) 44 Cal.2d 715, 729 [285 P.2d 636] (trial court held three-week hearing); *Caminetti v. Pacific Mut. Life Ins. Co., supra,* 23 Cal.2d at pages 98–99; *Carpenter, supra,* 10 Cal.2d at page 321; *Garamendi v. Mission Ins. Co.* (1993) 15 Cal.App.4th 1277, 1283 [19 Cal.Rptr.2d 190]; *Abraugh v. Gillespie* (1988) 203 Cal.App.3d 462, 465 [250 Cal.Rptr. 21]; *Maloney v. Rhode Island Ins. Co.* (1953) 115 Cal.App.2d 238, 242–243 [251 P.2d 1027].

claim. The claimant's submission and the commissioner's investigative activities combine to create the equivalent of an administrative record from which it can be determined what evidence was considered by the commissioner. The commissioner's resolution of claims must be guided by the law applicable to the subject matter of the individual claim and is reviewed for its adherence to such law. (*Quackenbush v. Mission Ins. Co., supra,* 46 Cal.App.4th at p. 466.)

■ Because the commissioner's determination of claims resembles an adjudication, and the trial court's statutory role is solely one of review, we conclude that it is appropriate to apply a rule analogous to that applied by trial courts in reviewing adjudicatory administrative decisions under Code of Civil Procedure section 1094.5. While the trial court may accept and consider evidence that was not before the commissioner in reviewing the rejection of a claim, the court may consider that evidence solely for the purpose of ruling on issues *other than* the merits of the claim. Such extrinsic issues may include the thoroughness of the commissioner's investigation, the fairness of the commissioner's procedures, or the commissioner's unjustified failure to consider relevant evidence. (See, e.g., *State of California v. Superior Court* (1974) 12 Cal.3d 237, 257 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Nightlife Partners, Ltd. v. City of Beverly Hills, supra,* 108 Cal.App.4th at pp. 88–89.)[11]

■ In contrast, the commissioner's exercise of discretion in ruling on the merits of a claim must be evaluated only by reference to the evidence actually considered by the commissioner. Allowing the trial court to second-guess the commissioner's judgment on the basis of evidence that was not before the commissioner would undercut the Legislature's assignment to the commissioner of primary responsibility for the determination of claims, since parties could withhold critical evidence from the commissioner in favor of a hearing in the trial court. It would also shift the role of the trial court from the review anticipated by the Legislature toward de novo adjudication of claims, depending upon the nature and extent of new evidence proffered. Finally, allowing the trial court to base its review on extrinsic evidence would be inconsistent with the abuse of discretion standard, since any judgment of the reasonableness of the commissioner's exercise of discretion in adjudicating a claim necessarily must be based on the evidence on which the commissioner actually based his or her decision. For these reasons, a claimant cannot be permitted to use the occasion of the trial court's review of the merits of a claim under Insurance Code section 1032 to supplement the

---

[11] When the issue is the fairness and thoroughness of the agency's procedure, the trial court exercises its independent judgment in evaluating the evidence, rather than deferring to the agency's weighing of evidence. (*Nightlife Partners, Ltd. v. City of Beverly Hills, supra,* 108 Cal.App.4th at p. 89.)

record with evidentiary materials that could have been, but were not, submitted to the commissioner.[12]

B. *The Commissioner's Determination of Appellants' Claims*

 1. *Estoppel*

As an initial matter, appellants argue in their reply briefs that the commissioner should be "estopped" from asserting that the trial court's review was restricted to evidence that was actually before the commissioner. According to appellants, counsel for the commissioner stated in correspondence that appellants would be given an opportunity to submit new evidence during the OSC proceeding. While it is by no means clear that the doctrine of estoppel could be applied to avoid the statutory scheme, we need not resolve that legal question because appellants' claim of estoppel lacks factual support.

The letter in question, dated April 12, 2002, responds to a letter from appellants' counsel. Appellants' counsel's letter, written after receipt of the commissioner's denial of appellants' claims but before the filing of appellants' request for an OSC, suggests that the parties "stipulat[e] to the OSC" because "we were concerned about the impact the contents of our declarations might have on any possibility of resolving these claims." The letter from the commissioner's counsel begins by noting, "[W]ith respect to your concern about the contents of any declarations that you file with your OSC Application, please be aware that the application will not be your last opportunity to brief the merits of your clients' claims." After a discussion of the typical procedural steps in an OSC proceeding, counsel stated, "[I]f you are concerned about what information to put into a declaration . . . you can take some comfort in the fact that, if your OSC Application is filed timely, you will have additional opportunities in the future to brief the merits of the claims and to support them with appropriate declarations and other evidence."

Contrary to appellants' claim, the letter does not constitute a commitment to permit new evidence to be submitted to the trial court, but only "appropriate" evidence. Moreover, the context of the letter, written in response to an inquiry by appellants' counsel about the timing of evidentiary submissions, makes clear that the commissioner's attorney was merely discussing at what point in the OSC process evidentiary submissions must be made, not the content of those submissions. Regardless of the contents of the letter, however, it could not support a claim for estoppel. A claim of estoppel would

---

[12] This ruling on the appropriate use of evidence during an Insurance Code section 1032 review is restricted to the trial court's review of claims determinations. As noted above, a different rule may be appropriate, and has implicitly been adopted, when the trial court is reviewing such inherently discretionary actions as the adoption of a plan of rehabilitation.

require appellants to show that they relied on the letter in failing to submit evidence to the commissioner during the commissioner's consideration of their claims. By the time the letter was written, however, their claims had already been denied. Because any decision about the submission of evidence in support of their claims was necessarily made long before the letter was written, it could not support an estoppel.

■ Having determined what evidence may be considered in reviewing the commissioner's rejections, we proceed to evaluate each of appellants' claims. "On appeal . . . we review factual findings of the trial court for substantial evidence, resolving all evidentiary conflicts in favor of the judgment." (*Low I, supra,* 101 Cal.App.4th at p. 1368.)

### 2. *Fraudulent Inducement*

■ The elements of a cause of action for fraudulent inducement to an employment contract are (1) that the employer misrepresented or concealed a material fact during the hiring process, (2) knowledge of the falsity of the fact or lack of reasonable grounds for believing it to be true, (3) an intent to induce reliance, (4) justifiable reliance by the employee, and (5) resulting damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) Appellants contend that, in order to induce them to join as employees, Golden Eagle's managers falsely represented the company as a reputable, honest insurance company, all the while aware the company was embroiled in fraudulent accounting schemes designed to cover its financial problems.

Appellants, however, did not submit sufficient evidence to support these contentions until they were before the trial court. Appellants' evidentiary submissions to the commissioner, primarily their descriptive statement and the class action complaint, lack any detailed description of the fraud allegedly practiced upon appellants. The descriptive statement, which contains claims for defamation and intentional infliction of emotional distress, does not mention the circumstances of appellants' hiring. Although the complaint alleges in conclusory terms that misrepresentations were made, neither the content, maker, nor recipient of any specific misrepresentation is identified; Auen is not even mentioned. The depositions of appellants reviewed by the commissioner touch on their hiring, but there is no mention of false representations.

Appellants' submissions do contain a wealth of information about the fraudulent business practices at Golden Eagle, and appellants argue that the commissioner is estopped from denying that these fraudulent business practices existed, having acknowledged them in other judicial pleadings. This

argument misses the point. The fraudulent practices at Golden Eagle during the time of appellants' employment were not used to induce appellants to sign employment contracts. Proof of these practices is not an adequate substitute for proof that a fraud was individually practiced upon appellants in their hiring.

Citing federal bankruptcy procedure, appellants contend that their claims were entitled to a prima facie presumption of validity. As noted above, however, federal bankruptcy practice is significantly different from California's insurance insolvency laws in this regard. Claims in bankruptcy court are afforded a statutory presumption of validity by title 11 United States Code section 502(a). (See *In re Wrenn* (11th Cir. 1994) 40 F.3d 1162, 1166.) There is no comparable statute in the Insurance Code. Under federal bankruptcy practice, the court determines the validity of the disputed claims, while the role of the trustee is to examine and object to improper claims. (11 U.S.C. § 704(5); *In re G.I. Industries, Inc., supra,* 204 F.3d at p. 1280.) A presumption of validity thereby assures that any claim that is not subject to an objection is accepted. In contrast, the commissioner must evaluate and affirmatively rule on each filed claim against an insolvent insurance company; there is no procedural need for a presumption of validity. In the absence of both statutory authority and procedural necessity for such a presumption, we decline to imply it. Rather, it is the responsibility of claimants, as stated in the commissioner's proof of claim notice, to submit sufficient explanation and evidence to demonstrate the validity of their claim.

While appellants filed declarations with the trial court, containing evidence of just the type of individualized fraud necessary to prove their claims, that evidence was never submitted to the commissioner during the claims determination process, and appellants did not take advantage of the trial court's offer of a remand to allow the commissioner to consider it. For that reason, the trial court properly declined to consider the declarations, and they cannot be considered here. Based on the record before the commissioner, which contains ·virtually no evidence of fraud in the inducement of either appellant's employment, the commissioner did not abuse his discretion in rejecting appellants' claims for fraudulent inducement.

### 3. *Wrongful Termination*

Appellants premised their claims for wrongful termination on the allegations that they (1) separately became aware of fraudulent business practices at Golden Eagle, (2) revealed that knowledge to their superiors, and (3) were forced out of the company as a result. Appellants face an immediate hurdle to their claims. Because both appellants resigned from their jobs at Golden Eagle, rather than being terminated, they are required to demonstrate

that they were constructively discharged. "[A]n employee cannot simply 'quit and sue,' claiming he or she was constructively discharged." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1246 [32 Cal.Rptr.2d 223, 876 P.2d 1022], overruled on other grounds in *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 498 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) "In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. [¶] For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner v. Anheuser-Busch, Inc.*, at p. 1251; see *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1305 [130 Cal.Rptr.2d 347] [" 'Constructive discharge occurs when the employer's conduct effectively forces an employee to resign' "].)

The commissioner contends that Auen failed to provide evidence that "intolerable" working conditions forced him from his job. The record before the commissioner provided little evidence of the conditions prevailing at the time of Auen's resignation. The descriptive statement states that Auen first learned of fraudulent business practices at Golden Eagle in "early 1996," after which he approached his supervisor to report his concerns. The statement claims that the supervisor told Auen to ignore the irregularities and not to discuss them with anyone else, on pain of possible termination, but it does not indicate how or whether that warning affected his working conditions. The only other possibly relevant evidence referred to in the descriptive statement is a January 30, 1997 letter from Golden Eagle's outside counsel to the commissioner's office commenting on the class action complaint filed that day by Curry. Auen claims the letter illustrates a "conspiracy" against him. Although it does not expressly name Auen, the letter undoubtedly refers to him when noting that Curry's counsel was representing a second employee still at Golden Eagle who has "systematically removed files and computer information from the premises of Golden Eagle." The letter suggests that the company would "force the issue by terminating the employee." Since the commissioner took control of Golden Eagle the next day, the company was never able to carry out this intention.

There is little, if any, additional information about Auen's working conditions around the time of his resignation. The class action complaint contains no reference to Auen. The only evidence in Auen's deposition, taken over a month before his resignation, is that his direct supervisor no longer assigned

certain claims to him to avoid his detection of further fraud.[13] Despite this treatment, Auen did not resign from Golden Eagle until one month *after* the commissioner had assumed control of the company, giving two weeks' notice on February 28, 1997. By this time, an investigator for the commissioner had been appointed deputy conservator to manage the company. Top management of the company had changed hands, with the "senior managers . . . removed from their positions" and "[t]he remaining executive staff . . . reorganized." There is no evidence of adverse working conditions for Auen after the change in management. On the contrary, Auen's supervisor told the commissioner during an interview that "Auen simply walked in one day, handed in a resignation, and said he had gotten another job. . . . Auen had never complained to [the supervisor] about any beliefs that wrongdoing was going on at Golden Eagle and [the supervisor] was aware of no strife or workplace incidents that led up to the resignation." Even if intolerable conditions had existed after the takeover, there is no evidence that the new management was aware of it. In short, there was virtually no evidence to support a constructive discharge of Auen, and the commissioner did not abuse his discretion in rejecting Auen's claim on this ground.[14]

Unlike Auen, Curry resigned from Golden Eagle before most of the controversy over the alleged fraud occurred. Again, appellants submitted little evidence bearing on Curry's working conditions at the time of his resignation. In the descriptive statement, Curry alleges that he discovered Golden Eagle's fraudulent accounting practices in April 1996, when a former customer complained to him. Curry reported the problems to his supervisor, but they were not addressed. Curry then made his own investigation and uncovered additional examples of similar fraud.

On May 20, 1996, Curry drafted a letter to Golden Eagle's chief executive officer (CEO) which the descriptive statement characterizes as "outlin[ing] his findings and concerns in detail."[15] According to the descriptive statement, he delivered the letter the next day. Later that day, Curry was called into the office of his supervisor, George Palmer. The statement alleges that Palmer both told Curry that he would never be fired because he now knew the company secret and threatened that Curry would never work in the insurance industry again if he did

---

[13] When interviewed by the commissioner, this supervisor contradicted Auen, stating that he was unaware of Auen's allegations of wrongdoing at the company.

[14] Again, in a declaration submitted to the trial court after filing of the OSC Auen details harsh working conditions at Golden Eagle, although not new management's awareness of those conditions. Because it was not submitted to the commissioner, we cannot consider the evidence contained in this declaration.

[15] The letter describes "strange things" that Curry had found with respect to only two particular claims, although it mentions that similar alterations appear to have been made to other, unidentified, claims. Mild in tone, the letter is informational and makes no threats.

not cooperate in covering it up. Two days later, on May 23, Curry permanently failed to appear for work. A letter written by appellants' counsel at the time, submitted with the descriptive statement, indicates that two days after that, on May 25, 1996, Curry and Auen's counsel had a breakfast meeting with Golden Eagle's counsel at which counsel discussed "what [Curry and Auen] believe to be fraudulent, even criminal, conduct being engaged in by Golden Eagle Insurance Company." The letter, a followup letter to the meeting, elaborates on the allegations of fraud and gives a somewhat different account of the conversation Curry had with Palmer, asserting that the supervisor offered a bribe rather than threatening Curry's future industry employment. It does not mention any other working conditions that might have caused Curry's departure; on the contrary, it notes that counsel had been told that Curry was "sorely missed" at Golden Eagle and suggests that he would be willing to return to work if the fraud were cleared up. The sole reason given for Curry's departure is the existence of the fraud.

The class action complaint makes allegations similar to those in the descriptive statement and the letter. Curry's personnel file shows that on June 3, 1996, Curry was placed on an unpaid leave of absence, retroactive to May 24. In a letter to his counsel, Curry was given four days to return to work. When he did not return, he was terminated on June 10.

Curry's deposition testimony, taken almost eight months after these events, confirms the general outlines of this account, including the initial unresponsiveness of Curry's seniors, Curry's research in other claims, and the conversation with Curry's supervisor after he delivered his letter to the CEO. The deposition, however, adds details about the two days Curry remained on the job after delivering his letter. In the deposition, Curry repeated the claim that soon after the letter was delivered, Palmer told Curry both that his future employment was secure because he knew the secret and that it was threatened if he revealed the fraud. Curry also repeated that Palmer attempted to bribe him, although the timing of the bribe is unclear. After that initial conversation, according to Curry's deposition, Palmer "called me into his office approximately every 45 minutes" to threaten both his future employment and, Curry believed, his physical safety. In addition, an attorney for Golden Eagle left "approximately five or six" voicemail messages for Curry, stating that he wanted to discuss the letter with Curry. Although Curry returned the messages, the attorney never approached Curry to discuss the letter, despite passing him in the hall. Finally, on the morning of the day Curry left, Palmer called Curry into his office, sat him down and said, "Curry, I don't know what we are going to do with you," which Curry interpreted as a threat. When he left the office, Curry found that he had received another voicemail

from the attorney. When Curry walked over to the attorney's desk and offered to talk, the attorney became nervous and said it was "not that important" and they would talk about it later. Palmer then called Curry back into his office, although what happened is not stated. Curry decided at noon to leave.

During the investigation of Curry's claim, the commissioner's representative interviewed Palmer, who left the company several months before the conservatorship began. Palmer's account of the relevant events was very different from Curry's. Contrary to the implication of Curry's account, Palmer denied being aware that Golden Eagle was, in effect, cooking the books. Rather, Palmer said that before Curry wrote his letter to the CEO, Palmer, Curry, and Curry's attorney were friends who discussed among themselves "strange things" happening at Golden Eagle but were "not sure what it was." When Palmer became aware that Curry had written a letter to the CEO, Palmer was concerned that it might get Curry, his friend, in trouble. He called Curry into his office and told Curry that he would try to smooth things over. The two were joking when Palmer said to Curry, "[L]ook at it this way, if you are correct, you have job security, so you have nothing to be worried about." Palmer said that Curry's claims of subsequent meetings were "fabricated," denied saying that Curry would never work in the insurance industry again if he did not cooperate, and denied any implicit bribe. According to Palmer, on the morning Curry left the company the two had breakfast, and Palmer told Curry that he had successfully smoothed things over.

If he accepted at face value Curry's testimony about his interaction with Palmer over his last two days at the company, the commissioner could have found the type of "intolerable or aggravated" conditions that justify a finding of constructive discharge. However, Curry's account was flatly contradicted by Palmer, and the account is inconsistent with the friendly relationship Palmer claims to have had with Curry up to that time. It is also at least partially refuted by (1) Curry's willingness to return to work expressed on his behalf by his counsel immediately after Curry left work; (2) Golden Eagle's expressed eagerness to have him return; and (3) Curry's attorney's claim that it was the fraud, rather than any other working conditions, that precluded Curry's return. It is for the commissioner, not the appellate or trial courts, to weigh the credibility of witnesses in determining claims. The account of Palmer, combined with circumstances that are arguably inconsistent with Curry's testimony, provide substantial evidence to support the commissioner's decision. Accordingly, the commissioner did not abuse his discretion in rejecting Curry's claim for constructive discharge in violation of public policy.

Appellants cite *Jacobs v. Universal Development Corp.* (1997) 53 Cal.App.4th 692, 698–699 [61 Cal.Rptr.2d 364], arguing that a wrongful discharge occurs when an employer terminates an employee for refusing to participate in an unlawful practice. *Jacobs,* however, featured a termination rather than a resignation (*id.* at p. 696); it did not address the issue of intolerable conditions. In any event, there was no evidence before the commissioner to suggest that either appellant was required to participate in the fraud at Golden Eagle. Curry left within a few days of revealing his knowledge of the fraudulent practices, which were apparently carried out by others. Auen claimed that he had been intentionally steered away from working on files that were tainted by fraud. Appellants cite no authority for the proposition that an employee can be constructively discharged solely by virtue of his or her knowledge of fraudulent business practices of others.

Appellants claim that the commissioner's decision could not have been supported by substantial evidence because " '[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence.' " (*Walker v. City of San Gabriel* (1942) 20 Cal.2d 879, 881 [129 P.2d 349], overruled on other grounds in *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 37–38, 44–45 [112 Cal.Rptr. 805, 520 P.2d 29] and quoting *Edison Co. v. Labor Board* (1938) 305 U.S. 197, 230 [83 L.Ed. 126, 59 S.Ct. 206].) Appellants rely in particular on *Gregory v. State Bd. of Control* (1999) 73 Cal.App.4th 584 [86 Cal.Rptr.2d 575] (*Gregory*), which reviewed a decision under the crime victims restitution program, Government Code section 13959 et seq. In denying a victim's claim in *Gregory,* the administrative board relied on two statements prepared by police officers, neither of whom was involved in investigating the criminal incident that led to the loss. (*Gregory,* at p. 596.) The court noted that both reports "contain multiple hearsay," did not fall within any hearsay exception, and were not made at or near the time of the relevant events. (*Ibid.*) Because " 'mere uncorroborated hearsay does not constitute substantial evidence,' " the court held, the board could not base a denial solely upon the police reports. (*Id.* at p. 597.)

 Unlike the testimony of the police officers in *Gregory,* Palmer's statements, if given as sworn testimony in court, would not have been hearsay. He was a direct participant in the events he described. (See Evid. Code, § 1200.) Although it is true that the commissioner's decision makers, the trustees, did not themselves interview Palmer but relied on a "hearsay" report by their attorney of his conversation with Palmer, this type of hearsay is an inevitable by-product of the statutory scheme, which permits the commissioner to make his determinations on the basis of an investigation rather than a hearing. (*Webster, supra,* 46 Cal.3d at p. 353.) The commissioner, acting through the trustees, cannot be expected to conduct all interviews personally. He must depend upon those who are retained to act as his investigative eyes and ears to carry out such activities, and he may rely on the

reports of such persons. The substantiality of the commissioner's evidence must be determined not by the fact that it is contained in an investigative report but by the evidentiary value of the underlying evidence.

Although the commissioner is not bound by the provisions of the Administrative Procedures Act (APA)[16] in conducting his investigation, the provisions of Government Code section 11513, subdivision (c) of the APA provide a useful guide in this context. Section 11513, subdivision (c) allows the admission of testimony in an administrative hearing if it is "the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." Unlike the officers submitting reports in *Gregory*, Palmer was directly involved in the events at issue, and he appeared to have a clear recollection of them. The statements of such a person are the type of material on which responsible persons are accustomed to rely in the conduct of serious affairs. As such, Palmer's interview could constitute substantial evidence to support the commissioner's decision.[17] The fact that the commissioner relied on his investigator's report of Palmer's words rather than interviewing Palmer himself does not undercut the evidentiary value of Palmer's statements.[18]

### 4. *Defamation*

Appellants'[19] defamation claims are based on a January 30, 1997 letter written by outside counsel for Golden Eagle to the commissioner's office. In that letter, Golden Eagle's counsel characterizes the allegations in Curry's class action and the activities of appellants' counsel, who offered to accept $1 million in settlement of the class action, as "a prima facie case of attempted extortion." No evidence of actual damages was provided.

---

[16] Government Code section 11340 et seq.

[17] Although appellants contend that the commissioner's attorney mischaracterized his conversation with Palmer in the declaration he submitted to the trial court, that issue is irrelevant. As noted above, we cannot and do not consider any evidentiary materials that were submitted to the trial court after completion of the commissioner's review. We refer only to the Palmer conversation as originally related to the commissioner.

[18] Nor is it dispositive that Palmer was not under oath when interviewed. There is no requirement that all evidence considered by an administrative tribunal be given under oath. (See *MacDonald v. Gutierrez* (2004) 32 Cal.4th 150, 156 [8 Cal.Rptr.3d 48, 81 P.3d 975] [unsworn statement by an arresting police officer sufficient to support driver's license suspension]; *Lake v. Reed* (1997) 16 Cal.4th 448, 467 [65 Cal.Rptr.2d 860, 940 P.2d 311] [report of forensic laboratory need not be sworn to be accepted in administrative hearing at which no criminal penalties will be imposed].)

[19] "Appellants," for purposes of the defamation claim and that part of the intentional infliction of emotional distress claim premised on defamation, includes two of Curry and Auen's attorneys, Rick Bove and Andrew Dunk, who were listed as claimants in the claim submitted to the commissioner relating to these issues.

██ We agree with the commissioner that these statements are subject to the "official proceeding" privilege. Under Civil Code section 47, subdivision (b), statements made in the course of "any . . . official proceeding authorized by law" or "in the initiation or course of any other proceeding authorized by law and reviewable" by writ of mandate are absolutely privileged. The privilege applies to any communication made in such proceedings by a participant that has some connection or logical relation to the proceedings. (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 37 [32 Cal.Rptr.2d 200, 876 P.2d 999].) The term "official proceeding" extends to investigatory activities by public agencies. (*Braun v. Bureau of State Audits* (1998) 67 Cal.App.4th 1382, 1388–1389 [79 Cal.Rptr.2d 791].) The privilege is not restricted to statements made once a proceeding has been commenced, but may apply to statements made in advance. " 'The "official proceeding" privilege has been interpreted broadly to protect communication to or from *governmental* officials which may precede the initiation of formal proceedings.' " (*Hagberg v. California Federal Bank FSB* (2004) 32 Cal.4th 350, 365 [7 Cal.Rptr.3d 803, 81 P.3d 244], quoting *Slaughter v. Friedman* (1982) 32 Cal.3d 149, 156 [185 Cal.Rptr. 244, 649 P.2d 886].)

The allegedly defamatory letter was written the day before the commissioner seized control of Golden Eagle. By that time, the commissioner had already initiated, and was actively pursuing, a serious investigation into the business affairs of Golden Eagle in preparation for seeking relief under the insurance insolvency laws. Six weeks prior, a special deputy insurance commissioner and examiner was appointed by the commissioner to review Golden Eagle's affairs. This entailed a painstaking examination of certain business records of Golden Eagle, difficult discussions during a series of meetings with Golden Eagle officers and employees, and depositions of persons with knowledge of malfeasance at the company. The letter was written by outside counsel for Golden Eagle to the chief counsel of the Department of Insurance in the midst of this extensive investigation to "bring to the attention of the Commissioner activities of past and present employees of Golden Eagle involving potential criminal conduct and the threat of civil litigation designed to call into question [Golden Eagle's] credibility." It appears that the intention of the letter was to explain, in advance, Golden Eagle's decision to terminate Auen and to inform the commissioner of the results of the company's "internal investigation" into appellants' activities. Accordingly, the letter was written to the investigatory body by the party being investigated in an apparent attempt to further that party's interests in the investigation. It satisfies the requirements of the official proceeding privilege.

Appellants do not seriously dispute that the January 30 letter from Golden Eagle's counsel is privileged from a claim of defamation. Instead, they assert that their claim is based primarily on subsequent republication by Golden

Eagle's CEO of the charges made in the letter. There is no evidence of such republication in the record of investigation submitted by the commissioner to the trial court. The sum total of such evidence was an assertion in the descriptive statement that "as part of a concerted campaign to discredit the order of conservatorship, [the CEO] and numerous other GOLDEN EAGLE employees named herein, published [the letter] to numerous individuals and entities with the intent that the defamatory statements concerning claimants contained therein would be disseminated and published to the general public as part [of] the media coverage surrounding the order of conservatorship . . . ." This vague statement is insufficient to prove appellants' claim. It is not enough simply to state that republication occurred, without providing at least the identity of the persons involved in the republication. Only one person, the CEO, is actually identified as having republished the letter, and no recipient of the republication is named. While appellants are correct that republication of a privileged communication to a nonparticipant in the proceeding is generally not privileged (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365]), appellants do not appear to have provided the commissioner with actual evidence of such a republication.

In their submission to the trial court, appellants provided a copy of a letter written in 1998 by appellants' counsel to the commissioner. This letter was not included in the record submitted by the commissioner.[20] Appellants claim that this omitted letter brought to the attention of the commissioner sufficient facts to support their defamation claim. The omitted letter does not even mention Auen, Bove or Dunk. As to Curry, it states: "Golden Eagle made numerous statements that Mr. Curry was responsible for its problems with the Department of Insurance. In fact, Golden Eagle called Mr. Curry a 'rogue employee' and accused him of [wrongful activities]. [Golden Eagle's CEO] made numerous television and radio shows [*sic*] appearances where Mr. Curry's name was brought up and discussed. This conspiracy went so far as to create and backdate Golden Eagle internal memos to, as one such document said, 'create the record' in an effort to frame Mr. Curry." The omitted letter also refers to "rumors . . . circulat[ing]" that Curry was responsible for Golden Eagle's seizure. Despite appellants' claims, this letter also fails for vagueness. In setting out the initial charges, it fails to specify who made them or to whom they were made. Although the omitted letter states that Golden Eagle's CEO made appearances on television and radio "where Mr. Curry's name was brought up and discussed," the mere statement that Curry was "discussed" by the CEO does not provide evidence of defamatory statements. Curry was required, at a minimum, to specify the defamatory content of the discussions. On the basis of appellants' bare bones

---

[20] While other evidence of a campaign to discredit appellants in the press was provided to the trial court, this remaining evidence was never provided to the commissioner during his investigation. For the reasons stated earlier, we cannot consider it here.

"proof," the commissioner did not abuse his discretion in rejecting their claims.[21]

### 5. *Intentional Infliction of Emotional Distress*

Appellants' claims of intentional infliction of emotional distress are premised on the same facts that support their other causes of action. To recover on this tort, a plaintiff must demonstrate (1) " ' " 'extreme and outrageous conduct by the defendant,' " ' " (2) with the intention of causing, or reckless disregard of the probability of causing, emotional distress, and (3) resulting distress. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001 [25 Cal.Rptr.2d 550, 863 P.2d 795].) To be outrageous, the conduct " ' "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." ' " (*Ibid.*)

Given our conclusion that the commissioner did not abuse his discretion in finding that appellants failed to demonstrate the "intolerable" working conditions necessary to support a claim for constructive discharge, it follows that the commissioner did not abuse his discretion in finding a similar failure to prove the "extreme and outrageous" conduct necessary to support a claim for intentional infliction of emotional distress. Since the commissioner had before him essentially no evidence of nonprivileged conduct supporting appellants' claims of defamation and fraudulent inducement, the only evidence available to support appellants' intentional infliction claims would be the evidence developed in support of their claims for wrongful termination. Auen's evidence demonstrated little more than that he had been told to keep quiet about his discoveries of fraud. This type of personnel activity is insufficient to support a claim for intentional infliction of emotional distress. (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80 [53 Cal.Rptr.2d 741].) Although somewhat more information is available about Curry's working conditions, at least during the last two days of his employment, the commissioner's acceptance of Palmer's account of those days, rather than Curry's, provides substantial evidence to support his rejection of Curry's claim of intentional infliction of emotional distress.

---

[21] Appellants also submitted a declaration of counsel that details his communications with representatives of the commissioner during the pendency of appellants' claims. Appellants argue that the conduct of the commissioner's representatives should create an estoppel against the commissioner because "[a]t no time during the 5-year period that Appellants' Counsel was engaged in serial communications . . . were Appellants ever advised that the Commissioner had insufficient information concerning Appellants' defamation claims. *In fact, Appellants were advised to the contrary.*" (Original italics.) Despite this claim, we find no evidence in counsel's declaration that the commissioner's representatives made statements that reasonably would have led him to believe that appellants were excused from the obligation of submitting evidence to support their claims. At most, the representatives told counsel that appellants' claims appeared to have merit. This alone would not excuse compliance with statutory procedures.

## III. DISPOSITION

The trial court's judgment upholding the commissioner's rejection of appellants' claims is affirmed.

Marchiano, P. J., and Stein, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 27, 2005.