**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES D. WALLACE,
        *Plaintiff-Appellant,*

v.

CITY OF SAN DIEGO; CITY OF SAN
DIEGO POLICE DEPARTMENT,
        *Defendants-Appellees.*

No. 03-56552

D.C. No.
CV-01-00703-
JM/RBB

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
May 4, 2005—Pasadena, California

Filed August 25, 2006

Before: James R. Browning, Raymond C. Fisher, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Browning;
Dissent by Judge Bybee

10171

**COUNSEL**

Carolyn Chapman, Coronado, California, for the appellant.

Mark Stiffler, Deputy City Attorney, San Diego, California, for the appellee.

---

**OPINION**

BROWNING, Circuit Judge:

Plaintiff-Appellant James D. Wallace appeals the district court's order granting the Defendant-Appellee City of San Diego's ("City") motion for judgment as a matter of law and conditionally granting a new trial. The district court issued its order after a jury found that the City retaliated against Wallace in violation of the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §§ 4301 et seq., and awarded him $256,800 in damages. Wallace also appeals the district court's finding that the jury verdict "was against the great weight of the evidence." In addition, Wallace seeks reversal of the jury's finding that the City's violations of USERRA were not willful, precluding an assessment of liquidated damages.

We have jurisdiction over this appeal of the final judgment of the district court under 28 U.S.C. § 1291(a). We reverse the district court's grant of judgment as a matter of law as well as its conditional grant of a new trial. We hold that the jury's finding that the City constructively discharged Wallace and took other retaliatory actions against him in violation of USERRA was supported by substantial evidence and was not contrary to the great weight of the evidence. However, we affirm the jury's determination that liquidated damages should not be awarded because Wallace failed to preserve the issue for appeal.

I.

Wallace was employed as a police officer with the San Diego Police Department ("SDPD") from March 28, 1975 until October 10, 2000. In 1981, Wallace applied and was selected for a position as a police detective. In 1984, the SDPD promoted Wallace to the position of Sergeant.

Beginning in 1982, Wallace served as an officer in the Naval Reserve. As a reserve officer, Wallace served annual tours of active duty of two to three weeks, typically using paid leave time from the SDPD to do so. In 1991, Wallace was called up on active duty and served seven months in Operation Desert Storm in Iraq. Upon his return to the SDPD from Iraq, Wallace applied numerous times for promotions beyond the level of Sergeant, but was never considered. After serving in Iraq, Wallace continued to serve annual tours of duty. Upon returning from military leave in 1994, and again in 1995 and 1996, the SDPD assigned Wallace to a division of the department far from his home and gave him undesirable or reduced responsibilities. This occurred despite Wallace's seniority and that there were more convenient and more desirable assignments available within the department.

In December 1996, after serving 97 days of active duty, Wallace was assigned to the SDPD's Southern Division and began reporting to Lieutenant Jorge Guevara. In 1997, Guevara initiated an investigation of an incident in which Wallace was accused of striking a female police officer on the buttocks with a newspaper. The incident occurred as Wallace instructed the officer and several other officers with whom she was talking after a meeting to get back to their duty stations. During the investigation, Wallace stated that he was not aware that the newspaper he was carrying had struck the officer, and that, if it had, it was accidental. Nevertheless, in April 1997, three days before Wallace again left for military duty, Guevarra issued Wallace a reprimand and a disciplinary transfer. Wallace testified that in his experience as a supervisor,

this discipline was unusually harsh. However, Wallace did not appeal the decision as department policy permitted him to do, because he was leaving on active duty in three days, and as it was the first discipline he had received, he had no reason to believe it would become part of a pattern.

In July 1997, Wallace was assigned to investigate a citizen's complaint about a subordinate officer, James Needham. Shortly thereafter, in August 1997, Wallace served a brief tour of active duty. Upon his return, he completed his investigation and submitted it to Guevara. Guevara rejected the report and asked Wallace to make a number of changes. Wallace testified that in his time as a sergeant, he had never had a report rejected by a superior. Nevertheless, he made the requested changes and again turned the report in to Guevara, who again rejected it requesting further changes. Wallace once more made the requested changes. In October 1997, prior to having the completed report of the investigation approved, Wallace was called up for an extended tour of active duty. Prior to leaving on active duty, Wallace gave a copy of the draft report and underlying investigative materials to Officer Needham, the subject of the investigation. Wallace testified that he believed that under the State law, Needham had a right to see a copy of the report, and that this right trumped contrary department regulations, which in any event predated the state law. However, when Wallace returned from active duty in April of 1998, he was faced with an investigation and disciplinary proceedings concerning this conduct. As a result, Guevara served Wallace with a notice of adverse action which Wallace appealed to the police chief, who affirmed the disciplinary action.

In addition, upon his return, Wallace received his annual performance evaluation from Guevara, which covered the period September 1996 to September 1997. It was the first "below standard" evaluation he had received in his career with the SDPD. The evaluation cited a number of reasons for the below standard rating, including the alleged newspaper

incident. It also included a number of other instances of alleged misconduct which Guevara testified he had been informed of but, contrary to department policy, had not investigated. Wallace testified that in his experience, annual evaluations were not to be based on unsubstantiated or uninvestigated allegations, and he believed these instances were improperly considered in his rating. As a result of this evaluation, Wallace was placed on a 90 day supplemental performance review. In July of 1998, he received a rating of "competent."

Wallace testified that the usual procedure in the SDPD was to give an officer the annual performance evaluation very soon after the end of the year the evaluation covered, in this instance, in September 1997. Wallace told the jury that a supplemental performance review is intended to allow an officer a chance to correct poor performance, and is therefore intended to be imposed as soon after the incidents giving rise to the poor performance review as possible. In this instance, Wallace did not receive the supplemental performance review until many months after the end of the period for which he received the negative evaluation. Had Lieutenant Guevara put Wallace on a supplemental performance review in September 1997, Wallace would have been on military leave during most of the supplemental review period. Wallace suggested that Guevara departed from department practices and gave him the performance review when he returned as a punitive measure.

In August 1998, Wallace served a three week tour of active duty. In September, shortly after his return, he again received an annual rating of "below standard" predicated primarily on the disclosure of the investigatory information to Officer Needham.

In February 1999, Wallace learned that he was going to be called up for an extended tour of duty in Bosnia. At around the same time, division Captain Cheryl Ann Meyers denied Wallace's request to teach at the police academy on his day

off, though he had been doing so regularly since the early 1980s. Also in February, Guevara inquired whether Wallace could provide documentation of his attendance at weekend naval reserve drills. Wallace testified that his drills had never conflicted with his work schedule, and that such documentation had never been required of him before. He knew of no other reservist in the department who was required to provide it. On March 2, 1999, Wallace was given a one-day suspension as a result of the Needham incident.

In March 1999, Wallace was called up for active duty in Bosnia, and received orders running through July 1999. At that point, Wallace had attended no weekend drills since Guevara's request for documentation. Subsequently, Wallace's orders were extended until September 29.

On August 2, after Wallace had been away on military leave for over four months, and at about the time his tour was extended for a further 60 days, Guevara initiated an investigation of Wallace for teaching at the police academy on his day off without approval. In the same disciplinary package, Guevara initiated disciplinary action for Wallace's failure to provide documentation from his naval reserve commanding officer that he had attended his weekend drills, even though he had only inquired about such documentation two weeks prior to Wallace's leaving for Bosnia and had not ordered him to provide it, and despite Wallace's having attended no drills since that inquiry.

On August 4, while still in Europe, Wallace received the orders extending his tour of duty until September 29. Because the orders were back to back with his previous orders, Wallace was not required to fill out an additional notice of leave form with the police department. On the day he received his new orders, he faxed them to Guevara. On that same day, however, Guevara began a disciplinary investigation on Wallace for his failure to report to work on August 3, the day he had been expected back from his original orders.

Wallace returned from Bosnia on September 25 and took four days of military leave. On October 1, 1999, he received new military orders for a tour of duty in Bosnia running through March 2000. He delivered those orders to the SDPD on October 2, and filled out a leave request form. Because Guevara was not in the office, Wallace left the orders with Guevara's assistant. Pursuant to his orders, he then left for Bosnia. Upon reviewing the orders and the request for leave, Guevara refused to approve Wallace's military leave. On January 5, 2000, while Wallace was on active duty in Bosnia, Guevara began another investigation for Wallace's failure to report to work on October 2, 1999, and for being absent without leave after Guevara had refused to approve his leave request. At trial, Guevara testified that his intent was to discipline Wallace for his failure to inform the department of his whereabouts, rather than for failing to report to work. However, he admitted that the charge was for failure to report to work on a day when Wallace was on active military duty. He also admitted that he was without the authority to disapprove the leave request.

Shortly before Wallace returned from Bosnia in March 2000, Guevara and Meyers initiated termination proceedings against him based upon the three disciplinary packages Guevara had filed while Wallace was away on active duty. The termination package was served on Wallace on April 2, a few days after his return. Wallace returned to work under Guevara a month later, and on May 19, appealed his termination to the Assistant Chief of Police, Rulette Armstead. On June 27, Chief Armstead issued a five-page order rescinding the recommendation for termination and instead imposed a four-day suspension. In issuing the suspension, Chief Armstead concluded that Wallace had been "less than responsible in notifying [his] command of [his military] duty status in a timely manner" in August and October 1999, all the while recognizing that it was not reasonable for the SDPD to expect Wallace either "to report for duty at the Police Department when [he is] under military orders" or "to fill out a Leave of Absence

form in a timely manner if [he] is out of the country and under extended military orders." [ER 65] In addition, although Chief Armstead agreed that Guevara "did not have the authority to deny [Wallace's] request for military leave of absence," she nonetheless issued Wallace a warning that "further instances of misconduct" would be grounds for "more stringent action," including "termination." [ER 65]

Four days later, on July 1, 2000, Wallace was transferred from the Eastern Division to the Northern Division, much closer to his home. Wallace testified that he welcomed the transfer because he would no longer be working for Guevara, that he "[got] along pretty well" with his new supervisors and that he did not have negative experiences with them. However, on August 17, 2000, a month-and-a-half into the new assignment, Guevara nonetheless served on Wallace a performance evaluation of "unacceptable" for the previous year based on the disciplinary actions taken against him while he had been serving on active duty in Bosnia. In conjunction with this report, Guevara placed Wallace on another 90-day supplemental performance review, notwithstanding that Wallace was no longer under his direct command.

The following month, Wallace was assigned to investigate a citizen's complaint against one of his officers. When he spoke to the citizen, whom Wallace described as mentally impaired, she threatened to file a discrimination complaint against him if he failed to substantiate her complaint. With more than a month left on his supplemental performance review period, Wallace resigned from the SDPD on October 10, 2000.

At trial, Wallace sought to prove under USERRA that his resignation in fact constituted constructive discharge and that this and a number of the City's other adverse employment actions were undertaken in retaliation for exercising his rights as a military reservist. After receiving instructions that an adverse employment action includes constructive discharge,

reprimand, suspension or a decision causing a significant change in benefits, a jury found that the SDPD had retaliated against Wallace in violation of USERRA and awarded damages of $256,800. The district court set aside this verdict as "not supported by substantial evidence" and granted the SDPD's renewed motion for judgment as a matter of law, or, in the alternative, a new trial.

## II.

We review the district court's grant of judgment as a matter of law *de novo. Gilbrook v. City of Winchester,* 177 F.3d 839, 864 (9th Cir. 1999). In reviewing a grant of judgment as a matter of law, we apply the same standard used by the district court in evaluating the jury's verdict. *Freund v. Nycomed Amersham*, 347 F.3d 752, 760 n.8 (9th Cir. 2003). A jury's verdict must be upheld if it is supported by substantial evidence. *Johnson v. Paradise Valley Unified School District,* 251 F.3d 1222, 1227 (9th Cir. 2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *See id.* at 1227-28. While the court must review the entire evidentiary record, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id*. at 1227. The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Id.* Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000).

In determining whether an employer retaliated against a reservist for exercising his rights under USERRA, we must first decide whether the employee exercised such rights,

thereby coming within the class of persons protected by the statute. If so, then we apply the burden-shifting framework approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401 (1983). *See Leisek v. Brightwood Corp.*, 278 F.3d 895, 898-99 (9th Cir. 2002). "Under the scheme set forth in *Transportation Management*, the employee first has the burden of showing, by a preponderance of the evidence, that his or her protected status was 'a substantial or motivating factor in the adverse [employment] action;' the employer may then avoid liability only by showing, as an affirmative defense, that the employer would have taken the same action without regard to the employee's protected status." *Id.* at 899 (alteration in the original).

## III.

## A.

**[1]** USERRA prohibits employers from taking "any adverse employment action against any person because such person . . . (4) has exercised a right provided for in this chapter." 38 U.S.C. § 4311(b).[1] To the extent the district court concluded that actions taken prior to the time Wallace submitted his application for reemployment on April 4, 2000 could not as a matter of law be retaliatory, it was incorrect. Section 4312 of USERRA provides a right to reemployment for members of the armed services who (1) properly notify their employers of the need for a service-related absence, (2) take cumulative absence of no more than five years and (3) properly report to work or reapply for employment, depending upon the length of the absence. 38 U.S.C. § 4312. An employee exercises this right whenever he seeks reemployment after complying with

---

[1]Although the term "retaliation" is not used in USERRA, the gravamen of this section is to prohibit adverse employment actions taken in retaliation for the exercise of the rights provided by USERRA. *See Gagnon v. Sprint Corp.*, 284 F.3d 839, 853 (8th Cir. 2002) (Section 4311(b) sets out "[t]he USERRA standard for retaliation claims").

the requirements of the section.[2] The employee need not cite the appropriate sections of the statute when seeking reemployment or notify the employer of its legal obligation to reemploy him.

[2] On April 4, 2000, after taking military leave of more than 31 days, Wallace invoked his right to reemployment in conformance with USERRA by submitting a formal application for reemployment. However, even before this date, Wallace had repeatedly exercised his USERRA right to reemployment when on several occasions he gave proper notice of his need for a service-related absence, took military leave totaling less than 31 days on each occasion and reported to work within the time the statute prescribes. *See* 38 U.S.C. § 4312(a) and (e)(1)(A). Further, evidence in the record suggests Wallace's relationship with his superiors was strained at least in part due to his military service, which permits an inference that adverse employment actions were taken even before April 2000 because of his exercise of rights protected by USERRA.

## B.

[3] Constructive discharge occurs when, "looking at the totality of the circumstances, 'a reasonable person in [the

---

[2]USERRA sets forth the following requirements for the exercise of the right to reemployment: A person whose military leave was less than 31 days is entitled to USERRA's reemployment rights and benefits if that person "notif[ies] the employer . . . of [his or her] intent to return to a position of employment . . . . *by reporting to the employer*" upon completion of the period of service. 38 U.S.C. § 4312(e)(1)(A). By contrast, a person whose period of service was for more than 30 days but less than 181 days is required to notify the employer of his intent to return "*by submitting an application for reemployment* not later than 14 days after the completion of the period of service." *Id.* at § 4312(e)(1)(C). If the period of service was for more than 180 days, the employee has 90 days to submit an application for reemployment. *Id.* at § 4312(e)(1)(D). The jury was correctly instructed on the details of this statutory scheme. *See* Jury Instruction No. 15.

employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions.' " *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (alteration in the original).[3] We have said that "[i]n such cases the individual has simply had enough; she can't take it anymore." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998). "Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996). In order to prevail, "a plaintiff alleging a constructive discharge must show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Id.* at 1412.

Although "a single isolated incident is insufficient as a matter of law to support a finding of constructive discharge," *id.* at 1411-12, "we have upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years." *Watson*, 823 F.2d at 361; *accord Satterwhite v. Smith*, 744 F.2d 1380, 1383 (9th Cir. 1984); *see also Goss v. Exxon Office Sys. Co.*,

---

[3]Where a plaintiff alleges constructive discharge in violation of a federal statute, constructive discharge is governed by a federal standard. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004) (setting out standard for constructive discharge under Title VII). The dissent suggests that Wallace's USERRA claim may be governed by state law because constructive discharge, here asserted as a violation of his federally protected rights, can also be asserted as an independent cause of action under state law. We find no support for this view in the cases. *Suders* lays out an objective standard for constructive discharge without reference to state law. *Suders*, 542 U.S. at 141. Moreover, cases such as *Suders*, applying constructive discharge in the Title VII context, adapted the theory from the labor relations field, where it has, from the beginning, been an issue of federal law. *See id.* (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 894 (1984)); *see generally Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir. 1984) (tracing history of constructive discharge and citing cases).

747 F.2d 885, 887-89 (3d Cir. 1984); *Real v. Continental Group, Inc.*, 627 F. Supp. 434, 443-44 (N.D. Cal. 1986).

[4] Here, Wallace offered evidence of a pattern of discrimination and retaliation by the SDPD based upon his military status beginning as early 1991 and continuing through August 2000. The discriminatory conduct supported by the evidence includes (1) failing to consider Wallace for promotion beyond the level of sergeant; (2) imposing excessive and discriminatory disciplinary action in response to actual misconduct (the newspaper and Needham incidents); (3) refusing without justification or explanation to approve Wallace's requests for permission to teach at the Police Academy; (4) initiating disciplinary proceedings for Wallace's absence from work while he was on military duty in August 1999; (5) Guevara's refusing to approve military leave on October 2, 1999; (6) initiating termination proceedings and suspending Wallace for four days based on the foregoing discriminatory disciplinary action; (7) threatening Wallace that further misconduct could result in termination; and (8) issuing an "unacceptable" rating and putting Wallace on an additional 90-day supplemental performance review as late as August 2000. Although the evidence *may have permitted* the jury to conclude that some of this conduct was not retaliatory or discriminatory, but legitimate discipline, it did not *compel* such a conclusion, particularly when viewed, as it must be, in the light most favorable to Wallace. *See Johnson*, 251 F.3d at 1229. Moreover, Wallace presented evidence of a continuing pattern of hostile and discriminatory conduct that went largely unaddressed by the SDPD. This evidence was sufficient to permit the jury to conclude that the intolerable situation had not abated at the time of Wallace's resignation, and therefore, that a reasonable person in his position would have felt compelled to quit even as late as October 2000.[4]

---

[4]The dissent raises the specter that our conclusion in this regard would give Wallace "a free ticket to complain at any time after the actions taken

The district court placed considerable emphasis on evidence that Wallace's working conditions had improved somewhat in the time period immediately preceding his resignation, that there had been a delay between the time of the last overt discriminatory action to which he had been subjected and his resignation and that the event immediately precipitating his resignation was unrelated to his military service or to any discriminatory action on the part of the police department. But none of these factors precludes a conclusion that Wallace was constructively discharged. Similarly, the dissent maintains that we have disregarded the requirement that the intolerable conditions exist at the time of the employee's resignation. Dissent at 10197-98. Not so — instead, we conclude that this standard is met here.

First, although Wallace's transfer to the Northern Division may have incrementally improved his working conditions, the jury could have concluded, based on Guevara's "unacceptable" performance evaluation and related 90-day supplemental review in August 2000 — roughly 45 days into his new assignment — that Guevara was still willing and able to take continued discriminatory action against Wallace even after his transfer from the Eastern Division.[5] Moreover, viewing the

against him in the Eastern Division" and that "there was nothing SDPD could have done to correct the situation." Dissent at 10201. But our holding does not go so far as to preclude a finding in a proper case that the conditions of employment have sufficiently changed to bar a claim of constructive discharge. Rather, we hold that, given the fact-intensive nature of the reasonableness inquiry, *see Schnidrig*, 80 F.3d at 1411, the evidence in this case permitted the jury to conclude that "a reasonable person in [Wallace's] position would have felt that [he] was forced to quit because of intolerable and discriminatory working conditions," notwithstanding some mitigating changes in employment conditions had occurred since his transfer to the Northern Division on July 1, 2000.

[5]Although the dissent characterizes Guevara's August 17 evaluation as a mere "reminder of the conduct that the City had cured a month-and-a-half earlier by transferring Wallace to the Northern Division," Dissent at

evidence in the light most favorable to Wallace, the jury could have determined that the SDPD condoned the discriminatory behavior, given that the department had taken no disciplinary action against Guevara or Meyers, the two Eastern Division supervisors who had carried out the bulk of the retaliatory conduct. Indeed, in her order rescinding the termination recommendation and imposing the four-day suspension, Chief Armstead conceded that Guevara "did not have the authority to deny" Wallace's requests for military leave of absence. Thus, this case is distinguishable from the cases cited by the dissent, because the evidence here permitted a reasonable jury to conclude that Wallace's employment conditions had not sufficiently changed to preclude a constructive discharge claim, notwithstanding his transfer to the Northern Division. *See Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999) (harassing supervisors disciplined or fired months before alleged constructive discharge); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) (same).

[5] In addition, given Wallace's past experience with the

10198 n.3, this is an impermissible inference from the evidence drawn in favor of the SDPD. Viewing Guevara's evaluation in the light most favorable to Wallace, a jury could have concluded that the transfer to the Northern Division did not necessarily put an end to his "intolerable and discriminatory working conditions." For example, the jury could have concluded that Guevara retained supervisory authority over Wallace even *after* his transfer to the Northern Division, based on Guevara's 90-day supplemental performance review, which he issued well after Wallace had been transferred. Indeed, this evidence supports the inference that Wallace was facing another performance review at the expiration of the supplemental review period on November 17, 2000, perhaps with input from Guevara, and that such a review would likely include whatever transpired from the citizen's complaint. Our cases make clear that in reviewing a jury's verdict, we may not weigh the evidence (as the dissent would), because we are charged only with determining whether substantial evidence supports the jury's finding of constructive discharge, "even if it is also possible to draw a contrary conclusion from the same evidence." *Johnson*, 251 F.3d at 1227-28.

SDPD, the jury could have concluded that Wallace reasonably feared subsequent transfer to a less desirable post or to Guevara's division again. Moreover, although he was no longer working under Guevara or Meyers, Assistant Chief Armstead was still at the top of his chain of command. She had imposed the four-day suspension and had issued the threat that further misconduct would be grounds for termination. Indeed, one witness testified that Chief Armstead "had discriminatory animus or retaliatory motive towards Sergeant Wallace because he was in the military." And when asked whether the Chief did not like people in the military, the witness responded, "she didn't like this individual [referring to Wallace] in the military." Further, Armstead's testimony permitted the jury to infer that her decision to suspend Wallace arose primarily from his performance of his duties as a Naval reserve officer, and it was not required to credit her assertions to the contrary. The jury was permitted to consider all of this evidence and balance it against any evidence that Wallace's working conditions had improved. *See, e.g.*, *Draper*, 147 F.3d at 1110 n.2 (noting that "[t]he frequency and freshness of the instances of harassment *may* enter into" a jury's determination of constructive discharge, but that a jury is free to find constructive discharge "under *all of the circumstances*") (emphasis added). Thus, although evidence of an improvement in working conditions supported a conclusion contrary to that reached by the jury, it did not require such a conclusion.[6] Accordingly, the

---

[6]Moreover, in asserting that Wallace cannot prevail on a constructive discharge theory because his "working conditions were favorable for three months before he resigned," Dissent at 10196, the dissent again draws an impermissible inference from the evidence in favor of the SDPD. Specifically, the dissent improperly reads Wallace's testimony in the light most favorable to the SDPD when it states that Wallace admitted that "hostile conditions had abated for three months." Dissent at 10198. However, in light of Wallace's prior experience with the Eastern Division, Guevara's August 2000 "unacceptable" rating and 90-day supplemental review and the SDPD's failure to reprimand Guevara or Meyers for their retaliatory conduct, Wallace's testimony supports only the conclusion that he did not have negative experiences with his immediate supervisors in the Northern Division during his three months there; it says nothing about Wallace's

district court should not have usurped the jury's basic fact-finding authority, including the authority to weigh evidence and draw inferences from it. *See Johnson*, 251 F.3d at 1227-29.

**[6]** Finally, that Wallace resigned almost immediately following a civilian's threat to bring false charges of discrimination against him did not preclude the jury's finding of constructive discharge. Although the dissent is correct that the threatened charges might have been groundless and not survived investigation, there was evidence to support the conclusion that the department had a history of taking disciplinary action against Wallace for pretextual reasons and without investigation. The jury could have concluded that a reasonable person in Wallace's position legitimately would have feared being subjected to such proceedings again, and that the potential for such retaliatory conduct was high. Indeed, after Wallace had been given the four-day suspension for reasons the jury could permissibly have found pretextual, Chief Armstead threatened Wallace with termination for *any future misconduct*.

The dissent would hold that the SDPD's efforts to "accommodate" Wallace required him to give it the chance to "do the right thing in response to the '5150's' threatened complaint." Dissent at 10202. But nothing in the evidence compels the conclusion that the reduction of the SDPD's retaliatory termination of Wallace to a retaliatory four day suspension was an "accommodation," and it is improper to view it as such. As for the transfer, the record indicates that officers in the SDPD were periodically transferred to different divisions, and that

---

relationship with Chief Armstead, Meyers or Guevara. *See* Dissent at 10198-99. The dissent's contention that there is "nothing in the record on [Wallace's] relations with Armstead, Meyers or Guevara" ignores the evidence of Guevara's August 17 evaluation. Dissent at 10200 n.4. Given this and other evidence, the jury was free to conclude that Wallace's working conditions remained hostile and intolerable, notwithstanding the transfer.

Wallace had in the past been given undesirable transfers despite his seniority. Thus, the jury reasonably could have inferred that Wallace's most recent transfer to his preferred division was not an effort to "accommodate" him, but rather the result of standard SDPD policy unrelated to his claims of discriminatory conduct. Given this prior discriminatory treatment of Wallace, the jury could have concluded that a reasonable person would not have had the confidence to give the department another chance to "do the right thing."

[7] In sum, evidence of the SDPD's history of discriminatory conduct, its failure to take action against Guevara and Meyers and Guevara's retaliatory "unacceptable" performance rating and 90-day supplemental performance review *after* Wallace's transfer to the Northern Division, permitted the jury to conclude that, despite the absence of discriminatory action in the events immediately precipitating Wallace's resignation, the totality of the circumstances surrounding his departure from the police department was such that a reasonable person in his position would have felt that he had no choice but to quit. *See Watson*, 823 F.2d at 361.[7] Although the evidence *could* be viewed to support a finding that Wallace's working conditions were "favorable" to the point of barring a constructive discharge claim, as the dissent would conclude, the jury saw it differently, and substantial evidence supports its finding. We cannot disregard the jury's verdict simply because we would have weighed the evidence differently. Put

---

[7]Unlike the dissent, we do not view as conclusive Wallace's decision to remain on the job for a relatively short period of time after the last overt discriminatory action. Although the dissent would conclude otherwise, the jury could have viewed Wallace's efforts to stay on the job despite the intolerable conditions as evidence that he indeed had "the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (internal quotations marks omitted). And as we have already said, the rest of the evidence permitted the jury to conclude that, despite such a motivation, a reasonable person in Wallace's position would have felt forced to resign.

another way, we do not disagree that a jury *could have concluded* that Wallace failed to establish constructive discharge. But viewing the evidence in the light most favorable to Wallace and drawing all reasonable inferences in his favor — as we must — we cannot say that the evidence permits only a conclusion that is contrary to the jury's verdict. *See McLean*, 222 F.3d at 1153.

**[8]** On appeal, rather than show how the evidence fails to support the jury's verdict, the City engages in an effort to reargue the facts of the case. The City first argues that a number of adverse actions taken against Wallace were legitimate, and that it therefore rebutted any showing that the actions were discriminatory. Even if the City offered evidence of legitimate, non-discriminatory reasons for many of these adverse actions — an issue on which it bore the burden of proof — the jury was not required to credit this evidence. Indeed, the evidence presented to the jury permitted an inference that these disciplinary actions, while within department policy, were unusually harsh and simply provided a pretext for the City to discriminate against Wallace because of his military status. Moreover, the City fails to take into account evidence offered by Wallace which suggested these legitimate reasons were merely pretextual. For example, Everett Bobbitt testified that in his experience, the SDPD had never required a reservist to provide documentation of attendance at weekend drills, although City personnel procedures permitted the department to demand it. Accordingly, we cannot conclude that the evidence compelled a finding that these actions were not discriminatory.

Similarly, the City argues — and the court below held — that Wallace's testimony that he liked his immediate superiors and fellow officers in the division to which he was assigned subsequent to his four-day suspension precludes a finding of constructive discharge. While this improvement in conditions is certainly relevant to Wallace's claim of constructive dis-

charge, in light of the other evidence he presented, it does not compel a conclusion contrary to that of the jury.

**[9]** Because substantial evidence supported the jury's verdict, we conclude that the district court erred in granting judgment as a matter of law.

IV.

In the alternative to its grant of the City's motion for judgment as a matter of law, the district court granted the City's motion for a new trial, finding the jury's verdict "against the great weight of the evidence." We review the district court's grant of a new trial for abuse of discretion. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 818 (9th Cir. 2001). The district court may grant a new trial only if the jury's verdict was against the clear weight of the evidence. *Id.* at 819. "[A] district court may not grant a new trial simply because it would have arrived at a different verdict." *Id.* Accordingly, "if the jury's verdict is not against the clear weight of the evidence, we may find that a district court abused its discretion in granting a new trial." *Id.* In addition, "[i]f an exercise of discretion is based on an erroneous interpretation of the law, the ruling should be overturned." *Miles v. State of California*, 320 F.3d 986, 988 (9th Cir. 2003) (citing *In re Arden*, 176 F.3d 1226, 1228 (9th Cir. 1999)).

**[10]** As described above, the district court's ruling was based on two erroneous interpretations of the law. First, the district court erroneously held that only adverse employment actions taken after an employee formally asserts his statutory rights may constitute retaliation, and that only such actions may be considered in determining whether employment conditions rose to the level required for a finding of constructive discharge. Second, the district court erred in concluding that, as a matter of law, the evidence did not support a finding of constructive discharge. Because the district court based its grant of a new trial on its analysis of the City's motion for

judgment as a matter of law, these errors of law compel us to conclude that the district court abused its discretion in ordering a new trial.

In addition, after a careful review of the record, we hold that the jury's verdict was not against the great weight of the evidence, and for this reason as well it was an abuse of the district court's discretion to grant the City's motion for a new trial.

## V.

Wallace additionally appeals the jury's finding that the City's violations of USERRA were not willful, precluding an assessment of liquidated damages. Wallace's challenge to the jury's verdict on this issue is waived on appeal by his failure to make a timely motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). *Saman v. Robbins*, 173 F.3d 1150, 1154 (9th Cir. 1999) ("Rule 50(b) is to be strictly observed, and that failure to comply with it precludes a later challenge to the sufficiency of the evidence on appeal.") (citing *Johnson v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 48, 50 (1952); *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 217-18 (1947)). Accordingly, we decline to address Wallace's arguments on this issue.

## VI.

For the foregoing reasons, we REVERSE the district court's grant of judgment as a matter of law and its conditional grant of a new trial. Accordingly, we VACATE the judgment below and REMAND the case to the district court with instructions to enter judgment on the jury's verdict.

---

BYBEE, Circuit Judge, dissenting:

James Wallace had a checkered past with the San Diego Police Department ("SDPD"). On numerous occasions, he

had been reprimanded, disciplined, and suspended. Wallace was convinced that SDPD had it in for him, or at least that his supervisors, Captain Myers and Lieutenant Guevara, wanted to see him removed from the force. Wallace was further convinced that Myers and Guevara's disapproval of him was related to his service in the United States Naval Reserves. On May 19, 2000, after being suspended for multiple rules violations, Wallace was warned that he was receiving his last chance and that any future violations would be taken seriously.

In July of 2000, SDPD transferred Wallace to a much more favorable work assignment—the Northern Division—which was the assignment Wallace had been seeking. Wallace's new work assignment was closer to Wallace's home and Wallace was no longer under the supervision of Myers or Guevara. In his new work assignment, Wallace reported to two well-liked and well-respected officers with whom Wallace had not experienced any problems. In fact, Wallace testified that he did not have any difficulties in his new assignment and that his working conditions at the Northern Division were quite favorable. Wallace's working conditions in the Northern Division remained favorable for the duration of Wallace's employment with SDPD, which lasted until Wallace abruptly resigned on October 10, 2000.

In the beginning of October, while Wallace was on duty with SDPD, a "5150"—a woman with an apparent mental problem—threatened to file a racial discrimination complaint against Wallace.[1] Without waiting to see if she filed the complaint and without consulting his superiors, Wallace quit. He then filed this suit, complaining that he had been constructively discharged.

---

[1]The term "5150" refers to *California Welfare and Institutions Code* section 5150, which grants police officers authority to take into custody for the purpose of treatment and evaluation individuals the officers believe to be mentally disturbed. Wallace testified that officers use the term "5150" to refer to individuals they believe to be mentally disordered.

The district court held that Wallace could not, as a matter of law, prevail on his claim of constructive discharge and granted the city judgment as a matter of law. I think the district court got it right. I part company with the majority for two reasons. First, I do not believe the law permits Wallace to claim constructive discharge more than three months after the last incident of which Wallace could reasonably complain, and at a time when SDPD had made every effort to accommodate him. Second, Wallace cannot bring a constructive discharge claim when he quit on his own terms and when the precipitating event was the possibility that someone outside SDPD would file a claim against him. Without knowing whether such a claim would be filed, whether the claim would make sense, or whether SDPD would treat him fairly, Wallace quit and claimed that he was constructively fired. Because I do not think there is such a thing as a claim for "anticipatory constructive discharge," I respectfully dissent.

I

The majority concludes that "evidence that Wallace's working conditions had improved somewhat in the time period immediately preceding his resignation, that there had been a delay between the time of the last overt discriminatory action to which he had been subjected and his resignation . . . . [does not] preclude[ ] a conclusion that Wallace was constructively discharged." Maj. op. at 10187. I disagree. The fact that Wallace's working conditions were favorable for three months before he resigned vitiates any claim he may have had for constructive discharge. Furthermore, the fact that SDPD had attempted to accommodate Wallace by transferring him to his desired work assignment, where Wallace admitted he enjoyed his work environment, establishes that Wallace was not being constructively discharged when he quit. The majority's assertion to the contrary belies the law of this circuit as well as California's law governing constructive discharge.[2]

---

[2]Although Wallace's cause of action is based on the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C.

We have long required that an employee asserting constructive discharge establish that his or her working conditions were "intolerable '*at the time of the employee's resignation.*'" *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) (quoting *Brady v. Elixir Indus.*, 242 Cal. Rptr. 324, 328 (Cal. Ct. App. 4 Dist. 1987), *overruled by Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022 (Cal. 1994)); *see also Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999); *King v. AC&R Adver.*, 65 F.3d 764, 767 (9th Cir. 1995); *accord Turner*, 876 P.2d at 1026-27; *Garamendi v. Golden Eagle Ins. Co.*, 27 Cal. Rptr. 3d 239, 254 (Cal. Ct. App. 2005); *Cloud v. Casey*, 90 Cal. Rptr. 2d 757, 761 (Cal. Ct. App. 1999). We have previously held that an employee may not sustain a claim of constructive discharge when the intolerable working conditions stopped months before the employee resigned. In *Montero*, for example, we affirmed summary judgment in favor of the employer on an employee's constructive discharge claim because the behavior complained of had ceased three to four months prior to the employee's resignation. "By the time Plaintiff resigned she was not subject to intolerable working conditions. . . . Plaintiff was not constructively discharged, because no reasonable person in Plaintiff's position would have felt forced to quit when she did." *Montero*, 192 F.2d at 861. Similarly, in *Steiner*, we again upheld judgment for the employer on an employee's constructive discharge claim because the employee had been restored to her favored shift and the employer had fired the manager who was making her work environment intolerable two-and-one-half months previously. "Taken together, these facts suggest that . . . [the manager's] sexual harassment had been halted some time before she quit." *Steiner*, 25 F.3d at 1466. California courts have been equally strict in considering whether working conditions were intolerable *at the time of an*

---

§§ 4301 *et seq.* ("USERRA"), the theory he asserts is constructive discharge, which is a state law cause of action. Therefore, I examine California law in addition to our own precedent.

*employee's resignation. In Garamendi*, for example, the California Court of Appeal held that an employee could not sustain his constructive discharge claim because the employee resigned one month after control of his company had changed hands and the adverse treatment had stopped. 27 Cal. Rptr. 3d at 255.

By his own admission, at the time Wallace resigned, hostile conditions had abated for three months. Wallace testified that between July 1, 2000, and the date he resigned, October 10, 2000, he did not experience any friction or unpleasantries with any of his co-workers or superiors.[3] Specifically, when asked, "It's fair to say that you were happy as a bug in a rug to get out of Eastern [Division] and up to Northern [Division]," Wallace replied, "The change of scenery was very nice, yes." Counsel for the city continued, "But [the Northern Division] was certainly more favorable to you in terms of the

---

[3]Although Wallace received an "unacceptable" rating on his performance review on August 17, 2000, the performance evaluation does not change the fact that Wallace's last three-and-one-half months of employment were free from retaliatory conduct. The performance evaluation was based on Wallace's performance during the year prior to his transfer to the Northern Division. The review was, at most, a reminder of the conduct that the City had cured a month-and-a-half earlier by transferring Wallace to the Northern Division. Additionally, even if receipt of the dated performance evaluation on August 18 had created an intolerable work environment for Wallace, Wallace has no complaints about SDPD's conduct from August 18 until October 10—which is still insufficient to establish constructive discharge at the time Wallace resigned.

The majority suggests that the jury might have concluded that "Guevara retained supervisory authority over Wallace" and "was still willing and able to take continued discriminatory action against Wallace." Maj. op. at 10187-88 & n.5. This is rank speculation. I know of no evidence that Guevara could exercise continuing supervisory authority over Wallace, who had been transferred out of Guevara's division. Indeed, the majority's point is contrary to Wallace's testimony that after his transfer he would no longer "be working for Lieutenant Guevara, which was the issue." If the jury was engaging in the kind of speculation suggested by the majority, the district court was fully justified in concluding that the verdict was "against the great weight of the evidence."

fact that you were now going to be working for Captain Ramirez and more directly Lieutenant Guy Swanger, correct?" Wallace replied, "Correct. I was not going to be working for Lieutenant Guevara, which was the issue." Furthermore, Wallace testified that he and Lieutenant Swanger, "get along pretty well." When counsel for the city asked, "So in that roughly three-and-a-half month period [you worked at the Northern Division], you didn't have any incidents whatsoever, negative experiences, with your supervisor," Wallace replied, "Correct."

Furthermore, the fact that Wallace's personnel file, which contained records of his previous misconduct and discipline, accompanied him to the Northern Division does not change the fact that Wallace's last three months of employment were anything but intolerable. The mere existence of derogatory information in a personnel file does not establish constructive discharge. Personnel files are not intolerable working conditions; they may lead to some tangible action, but it is the action, not the files, that we must consider. Constructive discharge only occurs when " 'a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions.' " *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (quoting *Satterwhite v. Smith*, 744 F.2d 1380, 1381 (9th Cir. 1984)) (alteration in original). In fact, the work environment to which an employee must be subject before he or she may sustain a claim for constructive discharge must be " 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.' " *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (quoting *Turner*, 876 P.2d at 1026). While the presence of adverse information in a personnel file might support a claim of hostile work environment (for example, a claim of retaliation, *see Yartzoff v. Thomas*, 809 F.2d 1371, 1376-77 (9th Cir. 1987)), the mere existence of a personnel file with negative information in it is not, with-

out more, sufficient to create the intolerable working condition necessary to permit a finding of constructive discharge. *Compare Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (denying claim for constructive discharge where negative evaluation had no tangible consequences) *with Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (1990) (finding constructive discharge where unfounded negative evaluation lead to denial of merit pay). Moreover, we ought not to confuse a claim of hostile work environment with constructive discharge: Constructive discharge requires a "higher standard"—conditions so intolerable that a reasonable person must leave the job. *Brooks*, 229 F.2d at 930; *see also Manatt v. Bank of Am.*, 339 F.3d 792, 804 (9th Cir. 2003) (declaring the standard for establishing constructive discharge significantly higher than the standard for establishing a hostile work environment).

Even aside from the passage of time, Wallace cannot claim constructive discharge because SDPD took substantial steps to defuse his complaints. In Wallace's testimony, he admitted that SDPD's actions had greatly improved his work environment. Yet, if the majority's theory is correct, then Wallace could have quit at any time after his transfer to the Northern Division, irrespective of his confrontation with the "5150" and regardless of whether she filed a complaint.[4] The majority

---

[4]The majority complains that I have "improperly read[ ] Wallace's testimony in the light most favorable to the SDPD because I pointed out that "Wallace admitted that 'hostile conditions had abated for three months.' " Maj. op. at 10189-90 n.6. The majority claims that Wallace's own testimony "supports only a conclusion that he did not have negative experiences with his immediate supervisors in the Northern Division during his three months there; it says nothing about Wallace's relationship with Chief Armstead, Meyers or Guevara." *Id.* From this the majority concludes that the jury was free to conclude that Wallace's working conditions remained hostile and intolerable, notwithstanding the transfer." *Id.*

There is a difference between construing the evidence in a light most favorable to the jury and simply making up evidence. There is no evidence whatsoever that Wallace's working conditions "remained hostile and intolerable" in the Northern Division, and nothing in the record reflects that he had any contact with Armstead, Meyers or Guevara after he left the Southern Division. Wallace's own testimony is completely to the contrary to the thoughts the majority puts into the jury's collective mind.

has given Wallace a free ticket to complain at any time after the actions taken against him in the Eastern Division. In effect, there was nothing SDPD could have done to correct the situation.

II

Wallace's claim also fails as a matter of law because he quit in anticipation of, not in response to, an adverse employment action. Wallace quit after a citizen threatened to file a civil rights complaint against him. But Wallace cannot claim constructive discharge based on what he *thinks* his employer might do; an employer is responsible for its own actions and not for all the bad things an employee can imagine might happen. For an employee to succeed on a constructive discharge claim, the *employer* must be the party responsible for the employee's intolerable work environment. *See Brooks*, 229 F.3d at 924 (finding that, although a coworker's harassment was "egregious," the employer was not responsible for the behavior under the circumstances and, therefore, the employee could not succeed on a Title VII claim against her employer).

The majority is simply wrong to conclude that the fact "that Wallace resigned [al]most immediately following a civilian's threat to bring false charges of discrimination against him did not preclude the jury's finding of constructive discharge." Maj. op. at 10190. It is no excuse to say that SDPD "had a history of taking disciplinary action against Wallace for pretextual reasons and without investigation" and, therefore, "despite the absence of discriminatory action in the events immediately precipitating Wallace's resignation," "[t]he jury could have concluded that [Wallace] legitimately would have feared being subjected to such proceedings again." *Id.* at 10190. The precipitating event had absolutely nothing to do with SDPD or any of its employees. SDPD had no control over the "5150's" threat to file a complaint that Wallace believed was groundless. In fact, Wallace has presented no

evidence that SDPD knew anything about the event that Wallace claims forced him to resign.

SDPD never got a chance to react to the "5150's" groundless complaint against Wallace. As soon as the woman threatened to file a complaint, Wallace quit. He did not wait to see whether she ever actually filed a complaint (which, apparently, she never did); he did not wait to see whether any complaint that the woman filed would make any sense; and he did not wait to see how SDPD would have reacted to the complaint. Most importantly, he did not give SDPD the opportunity to respond appropriately to any forthcoming complaint. Instead, Wallace resigned, filed this suit, and asked the district court to find that he was constructively discharged based on the *possibility* that, *if* the woman filed a complaint, SDPD *might* have taken an adverse employment action against him. As the district court aptly explained, "[Wallace's] assumptions of what working conditions would become if a complaint had been filed simply fails to address the working conditions as they existed when the citizen made the alleged statement to [him]."

Given what SDPD had done to try to accommodate Wallace in response to his complaints, he was obligated to give SDPD the opportunity to do the right thing in response to the "5150's" threatened complaint. Instead, he took matters into his own hands, and now he wants SDPD to pay for it. That is not constructive discharge. I would affirm the judgment of the district court.

I respectfully dissent.