

FILED

NOT FOR PUBLICATION

MAY 06 2013

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| TRISHAN AIR, INC.; KERRY ACQUISITIONS, LLC; KOOSHAREM CORPORATION,<br><br>        Plaintiffs-Counter-Defendants - Appellants,<br><br>  v.<br><br>DASSAULT FALCON JET CORPORATION; DASSAULT AVIATION,<br><br>        Defendants - Appellees. | No. 11-56927<br><br>No. 2:08-cv-07294-VBF-CW<br><br>MEMORANDUM* |

| | |
|---|---|
| TRISHAN AIR, INC.; KOOSHAREM CORPORATION; KERRY ACQUISITIONS, LLC,<br><br>        Plaintiffs-Counter-Defendants - Appellees,<br><br>  v.<br><br>DASSAULT FALCON JET CORPORATION; DASSAULT AVIATION, | No. 11-56978<br><br>No. 2:08-cv-07294-VBF-CW |

_____

    * This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Defendants - Appellants,

and

FLIGHT SAFETY INTERNATIONAL, INC.,

Defendant-Counter-Claimant.

Appeal from the United States District Court
for the Central District of California
Valerie B. Fairbank, District Judge, Presiding

Argued and Submitted March 6, 2013
Pasadena, California

Before: KOZINSKI, Chief Judge, and WARDLAW and GOULD, Circuit Judges.

In this diversity action brought under California law, Trishan Air, Inc., Kerry Acquisitions, LLC, and Koosharem Corporation ("Plaintiffs") sued Dassault Aviation and its subsidiary Dassault Falcon Jet Corporation ("Dassault") to recover for losses resulting from the crash of a corporate jet that Dassault manufactured. Plaintiffs raised several claims, including state-law claims of negligence, strict products liability, breach of implied and express warranties, and intentional misconduct. On the basis of the jury's special verdict, the district court entered judgment in favor of Plaintiffs on the breach of express warranty claim in the amount of $3.5 million. This amount represented a 70% reduction of the amount

of damages to reflect the jury's finding that Plaintiffs were 70% at fault for the accident. The district court entered judgment in favor of Dassault on Plaintiffs' strict products liability and negligence claims based on the application of California's economic loss rule. Plaintiffs appeal the reduction in the award based on their comparative fault for the accident, as well as the district court's evidentiary and pretrial rulings that Plaintiffs claim improperly resulted in the application of the economic loss rule to bar recovery for their tort claims. Dassault cross-appeals, seeking judgment as a matter of law on the breach of express warranty claim.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I

We begin with Dassault's cross-appeal because, if we grant relief, we need not reach the issue of comparative fault. Dassault puts forth three independent reasons to believe the district court erred in denying its motions for judgment as a matter of law on the breach of express warranty claim. We review *de novo* the denial of a motion for judgment as a matter of law. *Lakeside-Scott v. Multnomah*

---

[1] Dassault also contends that, if Plaintiffs recover the full jury award, it is entitled to (1) a $3 million dollar reduction in damages to account for the money that Plaintiffs received in a settlement with their insurance brokers and (2) a reversal of the district court's order awarding Plaintiffs prejudgment interest. Because we affirm, we do not reach these issues.

*Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009).  And we apply the same standard used by the district court to assess when judgment as a matter of law is appropriate: We will not upset a jury verdict so long as the verdict is supported by substantial evidence.  *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2006).  We view the evidence presented in the light most favorable to the nonmoving party.  *Id*.  We review *de novo* a district court's interpretation of state law.  *Paulson v. City of San Diego*, 294 F.3d 1124, 1128 (9th Cir. 2002) (en banc).

## A

Dassault first contends that it is entitled to judgment as a matter of law on the breach of express warranty claim because there was no privity of contract between the parties and because "nothing in the aircraft manuals was shown to be a 'basis of the bargain' in [Plaintiffs'] purchase of the used aircraft from a private third party."  It's questionable whether privity of contract is required for actions based on breach of express warranty.  *See Hauter v. Zogarts*, 14 Cal. 3d 104, 115 n.8 (1975) ("Privity is not required for an action based on express warranty.").  But even if privity is required, the jury's finding of privity is supported by substantial evidence.  Plaintiffs presented evidence at trial showing that they bought a subscription service directly from Dassault for the operator's manual revisions and upgrades.  Plaintiffs also elicited testimony regarding the importance of the

manuals to this kind of aircraft. Based on this evidence, the jury could properly conclude, as it did in its special verdict, that "Dassault . . . engage[d] in a course of conduct directly with plaintiffs such that Dassault . . . was functionally in the position of a direct seller to plaintiffs of the manuals" and that these defective manuals were "an integral part of the aircraft."

**B**

Plaintiffs also offered evidence that a chart relating the plane's center of gravity ("C.G.") to the appropriate stabilizer pitch trim setting, which was included in Dassault's U.K. manuals but not in its U.S. manuals, would have helped the pilots avoid the accident. However, Dassault contends that Plaintiffs' pilots did not rely on the Dassault manuals and procedures, so any breach of express warranty by dint of omitting the chart was not a substantial factor in causing the accident. This argument centers on the pilots' admissions that they did not calculate the plane's C.G. on the crash date.

Plaintiffs offered evidence that the omission of the U.K. chart was a substantial factor in causing the accident, despite the fact that the pilots did not calculate the plane's exact C.G. on the day of the crash. The pilot, Captain Scott Michael, testified that he and other Trishan pilots "rel[ied] upon [the manuals] heavily for all our needs." He claimed that, had the chart been included in the

5

manual, he "[a]bsolutely" would have used it.  He also stated that "had I had this chart, the path I would have taken would have been much different.  You wouldn't be listening to me today."[2]  Captain Michael also refuted the contention that the chart would have done no good without a specific C.G. calculation.  He stated that "just your general knowledge of how the C.G. moves would allow you to . . . set more specific trim settings."  Because Captain Michael "knew that [he] had a forward C.G.," and had previously calculated the C.G. for the scenario he was in on the day of the crash, where there was "maximum weight forward . . . full fuel," his testimony supports the inference that he knew the approximate C.G. and could have used the chart with that knowledge.

A former Trishan pilot who was not involved in the crash, Captain John Govatos, explained that setting the trim in the green band would not obviate the

---

[2] Captain Michael testified:
Q: If you had [the U.K. chart], would you have used it?
A: Absolutely.
Q: Why?
A: Well, it's – if I could reference it maybe to a school zone, as you go through a school zone, you see the crosswalk sign and all of a sudden little, yellow flashy lights start going.  It starts out as something that you say, oh, oh, my goodness.  It's time – the kids are around.  I have to be very, very careful.  And you take actions appropriately so that you protect the safety of the children.  And had I had this chart, the path that I would have taken would have been much different.  You wouldn't be listening to me today.

need for the chart because "the aircraft will not give you a takeoff warning if [the control] is set within the green band; yet, the aircraft will not perform correctly if it is not set within the proper place in the green ban[d]." He stated that Trishan pilots "use the Dassault procedures" in the manuals, but that the manuals "said [to] set [the trim] in accordance with the C.G., and the green band corresponded with a forward C.G." The manual text said:

> Take-off Trim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Set
> Bring the tailplane back into the green take-off band by using the control on the control wheel to the appropriate position, which depends of [sic] the airplane CG position: e.g., FWD if the airplane has a forward located CG.

Nowhere does the manual say that the C.G. must be specifically calculated.

Yet another pilot, Captain Charles Tatum, testified that the chart would be "very valuable" because it "marries the C.G. bottom numbers with a trim setting."

He also suggested that Captain Michael would have set the trim at a different setting if he had access to the chart.[3]

We have held that "[w]hether or not the evidence in the record establishes liability on the part of the defendants depends on the resolution of disputed questions of fact and determinations of credibility, as well as on the drawing of inferences, all of which are manifestly the province of a jury." *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002). Both parties offered evidence to support their positions on causation. Upon review of this evidence the jury concluded in a special verdict form that "plaintiffs rel[ied] on Dassault Aviation/Dassault Falcon Jet's statement of fact in deciding to purchase/use the aircraft and/or manuals" and that "the aircraft and/or manuals fail[ed] to perform or have the same quality as

---

[3] Captain Tatum testified:
Q: And is this – well, in this case, I believe that the trim setting that was found at the end of the – in the cockpit was approximately 5.6 or so. Does that setting comport with what [the U.K. Chart] would tell you to do under the actual weight and C.G. conditions of the aircraft?
A: No, it does not.
Q: If this chart was available to Captain Michael, based upon what you understand his knowledge and experience in the aircraft would be, where would the C.G. have – correction – where would the stabilizer pitch trim have been set, approximately?
A: Looking on the left-hand side, at the bottom, between seven and 7-30, which is 7.5. It's seven degrees, 30 minutes. Right there between 14 and 15, somewhere around in there.

represented," which "represented a substantial factor in causing the accident." The jury was free to take the pilot at his word and reject evidence offered by Dassault. *See id.* at 852. Because the jury's finding was supported by substantial evidence, and the evidence does not permit only one reasonable conclusion, we may not upset the verdict. *See Wallace*, 479 F.3d at 624. Stated another way, this issue was within the jury's province to decide, and it credited Captain Michael and other supportive evidence and decided for Plaintiffs.

## C

Finally, Dassault contends that it is entitled to judgment as a matter of law because, under *Johnson v. American Standard, Inc.*, 179 P.3d 905, 910–17 (Cal. 2008), the jury's finding that Plaintiffs were "sophisticated users" bars them from recovering on a breach of express warranty theory. We disagree. That case did not involve a breach of express warranty claim, *see id.* at 909, and it described the sophisticated user defense in limited terms as an exception that "negate[s] a manufacturer's duty to warn of a product's potential danger when the plaintiff has (or should have) advance knowledge of the product's inherent hazards," *id.* at 907. We do not believe that the California Supreme Court would apply this policy-based defense to this context where Dassault expressly warranted that the manuals contained sufficient information to fly the aircraft safely.

Turning to Plaintiffs' appeal, we next consider whether the district court erred in reducing Plaintiffs' award on the breach of express warranty claim by the amount of Plaintiffs' comparative fault for the crash. When interpreting state law, we follow decisions of the state's highest court unless the state's highest court has not spoken on the issue, in which case we "determine what result the [state's highest] court would reach based on state appellate court opinions, statutes and treatises." *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991).

The California Supreme Court has not expressly decided whether comparative fault applies to breach of express warranty claims such as the one at issue here. California Supreme Court decisions can be read to support both sides of the argument. *Compare Kransco v. Am. Empire Surplus Lines Ins. Co.*, 2 P.3d 1, 10 (Cal. 2000) (noting that "contractual breaches are generally excluded from comparative fault allocations"), *with Daly v. Gen. Motors Corp.*, 575 P.2d 1162, 1165–69 (Cal. 1978) (applying comparative fault to strict products liability claims and framing the doctrine's goals in broad terms), *and Knight v. Jewett*, 834 P.2d 696, 707 (Cal. 1992) (stating that a jury may use comparative fault to achieve "equitable apportionment" based on relative responsibility "whether . . . responsibility for the injury rests on negligence, strict liability, or *other theories of*

*responsibility*" (emphasis added)). California Court of Appeal decisions also point in different directions. *Compare Shaffer v. Debbas*, 21 Cal. Rptr. 2d 110, 114 (Cal. Ct. App. 1993) (stating that "comparative negligence is not a defense to a breach of express warranty action"), *with Milwaukee Elec. Tool Corp. v. Superior Court*, 19 Cal. Rptr. 2d 24, 29, 32–37 (Cal. Ct. App. 1993) (supporting the opposite conclusion).

Regardless of whether the California Supreme Court would apply comparative fault in all cases of breach of express warranty, we conclude that because the contract-based claim at issue here is essentially an equivalent, alternative method of pleading the same basic theory of liability as the tort claims, the California Supreme Court would have applied comparative fault in this case. *See Brown v. Superior Court*, 751 P.2d 470, 484 (Cal. 1988) (considering the overlap between claims and holding that if strict liability does not permit recovery, implied and express warranty claims are also barred); *see also Milwaukee Elec. Tool Corp.*, 19 Cal. Rptr. 2d at 29 (noting that two separate causes of action, for strict products liability and breach of express and implied warranties, could be treated as "equivalent, alternative methods of pleading the same basic theory of liability" under the circumstances).

Because we affirm the reduced jury award, we do not address whether the district court made errors that resulted in the economic loss rule's barring recovery on Plaintiffs' tort claims. Even if Plaintiffs had succeeded on the tort claims, they would still be unable to recover more than 30% of the total damages award because comparative fault applies to tort claims. *See Daly*, 575 P.2d at 1172–73. Plaintiffs already recovered this amount.

**AFFIRMED.**